MULCAHY ET AL. *v.* STATE

(Three Appeals in One Record)

[No. 102, September Term, 1959.]

414

*Decided February 16, 1960.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Leonard S. Jacobson,* with whom were *Alvin Sellman* and *George W. McManus, Jr.,* on the brief, for the appellants.

*Robert C. Murphy, Special Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General,* and *Saul A. Harris, State's Attorney for Baltimore City,* on the brief, for the appellee.

HORNEY, J., delivered the opinion of the Court.

William McClelland, George M. Stein and Roland F. Mulcahy (McClelland, Stein and Mulcahy, or, collectively, the defendants)—and James B. Gatton (Gatton), better known as

Edward B. Armstrong, who plead guilty and did not appeal—were indicted in Baltimore City on a four-count indictment for breaking a warehouse, grand larceny and receiving stolen goods and with being rogues and vagabonds. The defendants plead not guilty as to each count and elected to be tried by a jury. They were found guilty of breaking the warehouse and each was sentenced to seven years' imprisonment. This appeal [three in one record] is from the judgments entered and sentences imposed.

The warehouse of the Apex Express Company (Apex) on Georgetown Road was burglarized in the early morning of February 1, 1959. An eye-witness—the rear of whose home was adjacent to the warehouse—saw two men enter the building and go up the stairway between 2:15 and 2:20 a.m., and saw three men return "with what appeared to be a safe." Only two of them were carrying the safe. On the way out to the street something must have scared them for they "dropped the safe and two [of them] ran in behind the building which was directly beneath [the eye-witness'] window," where they waited for a few seconds and then ran to the front of the warehouse and "picked up the safe." The eye-witness called the police and informed them of what he had observed and when they arrived on the scene he gave them a general description of the clothing worn by the men and boy he had seen.

At about the same time [2:15 a.m.] that the eye-witness was watching these events from the rear of his home, an officer [James Sanders] on his regular route in a post car had noticed an automobile parked approximately one hundred yards from the warehouse and purposely driving slowly by and close to it, he was able to observe the make, colors, year model and the fact that it had a "sprung hood." At the same time he saw "one subject behind the steering wheel" and another outside "on the passenger side." He continued on his route, but when he received a call over the police radio a few minutes later that "someone was with a safe" in the 3200 block of Georgetown Road, he returned immediately to the warehouse where he interviewed the eye-witness and his wife. Within only a minute or two thereafter a police sergeant

[Robert Larkin] also arrived on the scene. An inspection by the officers disclosed that the front door as well as a door on the second floor had been forced and that "there was no safe there." Thereupon, the known information was called in to headquarters and was promptly broadcast to the post and prowl cars at 2:28 a.m. While they knew a safe was missing, the police did not know the estimated money contents until they had been informed by the terminal manager of Apex after the suspects had been arrested.

When the message was received by Officer John McGahagan he was sure that the description of the automobile as a two-tone blue and cream or white Buick fit that of an automobile claimed by McClelland, whom the officer knew. The broadcast, in addition to informing all officers on patrol that a "safe burglary" had been committed, had also related that there was "more than one" person involved and that one of the suspects had a "dark blue coat, one had a black jacket and one was wearing a brown topcoat." Upon going to McClelland's home and finding him absent, Officer McGahagan and the officer riding with him cruised around until they located the McClelland automobile between 2:35 and 2:40 a.m. "about a half a mile, maybe a mile" from the warehouse. They signaled the operator of the automobile to stop and when McClelland came over to the prowl car to inquire why he had been stopped, the officer sent him back to his automobile to get his registration card and called for additional assistance. Subsequently he arrested all four suspects. A crow bar, a metal bar, a steel drill, an extension light and cord and some gloves were found in the Buick at the time of arrest.

The defendants, along with Gatton, were taken to the district police station where they were interrogated and their clothing taken for analysis. Later, such analyses revealed that particles of paint removed from the clothing of McClelland and Stein were in all probability the same as the paint on the first floor point of entry to the warehouse. All of the defendants-appellants conceded that they had been previously convicted of other offenses.

Gatton, a seventeen-year old boy, immediately confessed his

participation, implicated the other three defendants and took the police to a Chrysler automobile also belonging to Mc-Clelland. The stolen safe was found in the trunk of this automobile, which was parked in the rear of McClelland's home. Gatton related then and testified at the trial that he and the defendants drank together until about 1:55 a.m., when they drove in McClelland's Buick to the vicinity of the warehouse and parked on Georgetown Road. As soon as they had parked Mulcahy went over to the warehouse with a crow bar while McClelland and Stein remained in the automobile and he (Gatton) stood on the outside. During that time a police car went by. When it had gone, Stein and the boy joined Mulcahy, entered the building and took the safe. Mulcahy and the boy carried the safe, but dropped it and hid when they saw headlights approaching. Thereafter they carried the safe away and stowed it in the trunk of the Chrysler. Gatton further testified that when they were stopped and arrested they had been "riding around" to "get another" safe.

During the course of his interrogation at the station, immediately after his arrest, Mulcahy admitted that he had been in two taverns drinking with McClelland, Stein and Gatton and had then ridden around for awhile but insisted they were going to get something to eat when the police picked them up. But later that same day when he was informed, after he had sobered up, that his companions had made statements, that one of them had pointed out the whereabouts of the safe and that all of them [including Mulcahy] would be charged with the crimes committed, Mulcahy remained silent and refused to say anything. In the oral statements made by both McClelland and Stein following arrest, which were neither confessions nor admissions but absolute denials of any complicity in the breaking and theft, and were admitted in evidence without objection, Mulcahy was identified as being with the other participants during the periods before and after the offenses had been committed. On behalf of himself, Mulcahy testified at the trial that on the night of the burglary he had been drinking heavily, that he left the last tavern they had visited around 1:15 a.m., and did not see his drinking companions again until about 2:30

a.m. when they picked him up in McClelland's Buick, and that he did not know he was charged with a crime until he "woke up" later in the day. The eye-witness was unable to identify Mulcahy as one of those persons he had seen at the scene of the burglary. Nor was the police officer, who had observed the parked Buick near the warehouse, able to identify the persons he had seen in and along side of the automobile.

With respect to the trial of the cases in the lower court, McClelland, in writing, before trial, and all of the defendants-appellants (including McClelland) orally, at the outset of the trial, moved to suppress the evidence to be presented against them on the ground that it had been obtained by illegal search and seizure. The court did not act on the written motion and when the oral motions were made, it neither determined the question then nor ordered it to be deferred for determination at the ensuing trial, but subsequent rulings clearly indicated an intention to reserve the questions. During the course of the introduction of testimony on behalf of the state, all of the defendants specifically objected to the admissibility of the crow bar and other articles (hereinafter referred to as the "burglary tools") found in the Buick. At this point the court reserved its rulings on that evidence and all articles then objected to were admitted in evidence one after the other without further objection other than a claim that some of the articles had not been sufficiently identified. At another stage in the state's case a photograph of the trunk of the Chrysler with the safe in it was offered in evidence and admitted, whereupon McClelland renewed his objection "pursuant to" his earlier motion, but, on this occasion, the court did not rule on the objection. There was also testimony by several witnesses that the safe and title to the Chrysler were found on the premises occupied by Mc-Clelland, all of which, as well as another photograph of the safe taken after it had been opened, was admitted in evidence without objection. At a still later stage the results of the analyses of the seized clothing of McClelland and Stein were also admitted in evidence without objection. [The result of the analysis of the clothing of Mulcahy was not incriminating]. Finally, at the conclusion of the state's case, McClelland moved to renew what appeared to be his motion to suppress the evi-

dence, and the court then directed that the record should "show that *all* motions were renewed and *all* motions were overruled." (Emphasis added.)

On this appeal all of the defendants contend that such evidence as was obtained as a result of the search of McClelland's home and automobiles was erroneously admitted in evidence against them. Moreover, McClelland and Stein contend that such evidence as was obtained as a result of the analyses of the clothing they were wearing when arrested was likewise inadmissible. The first question then—particularly with respect to the seized burglary tools and the clothing they were wearing—is whether the arrest of the defendants without a warrant was lawful. The interrelated second question affecting McClelland only, is whether evidence concerning the title to the Chrysler automobile and the stolen safe — which were seized in a search of the premises occupied by him without a warrant—was admissible. By the third and final question presented, only Mulcahy contends that the evidence was insufficient to corroborate the testimony of the accomplice [Gatton], who admitted participation in the burglary.

### (i). Legality of Arrest.

The arrest of all of the defendants was lawful. It is true, of course, that Article 26 of the Maryland Declaration of Rights prohibits the search of suspected places and the seizure of persons or property without a warrant, but this provision of the constitution does not prohibit arrest without a warrant when it is lawful and in cases where the public security demands it. In this state it has long been settled that a peace officer may arrest without a warrant, provided there were reasonable grounds to believe at the time of the arrest that a felony had been committed and that the person arrested had committed the offense. *Baltimore & O. R. Co. v. Cain,* 81 Md. 87, 31 Atl. 801 (1895); *Kirk & Son v. Garrett,* 84 Md. 383, 35 Atl. 1089 (1896); *Edger v. Burke,* 96 Md. 715, 54 Atl. 986 (1903); *Brish v. Carter,* 98 Md. 445, 57 Atl. 210 (1904); *Freedman v. State,* 195 Md. 275, 73 A. 2d 476 (1950); *Edwards v. State,* 196 Md. 233, 76 A. 2d 132 (1950); Kauffman, *Law of Arrest in Maryland,* 5 Md. L. Rev. 125,

159 (1941). In *Kirk & Son* and *Brish,* both *supra,* it was said, to use the language of the *Brish* case at p. 450, that it is "wholly immaterial whether the suspicion arises out of information imparted to the officer by some one else, or whether it is founded on his own knowledge." Furthermore, in the *Kirk & Son* case this Court said [p. 406] : "[i]t may be broadly stated that what amounts to probable cause * * * [will be] such reasonable grounds for suspicion of felony as will justify and require an officer to make an arrest." And in the *Edwards* case, *supra,* at p. 237, citing *Brinegar v. United States,* 338 U. S. 160 (1949), we stated in effect that the substance of all definitions of "probable cause" is a reasonable ground for believing that the person about to be arrested is guilty and that "probable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." Moreover, where circumstances make an arrest without a warrant lawful, it is permissible, as an incident to the arrest, to search the person of the suspect and to take into custody and examine the tangible evidence or instruments of the crime, whether upon his person or within his present or immediate possession. *Callahan v. State,* 163 Md. 298, 162 Atl. 856 (1932) ; *Carroll v. United States,* 267 U. S. 132 (1925).

Since the defendants had taken and carried away a warehouse safe and its contents of the aggregate value of $100 or more, which constituted a felony, after they had broken into the warehouse with an intent to commit felony therein, which under the statute was a misdemeanor, the real question is whether there was probable cause, that is, whether the arresting officer had such reasonable grounds for suspecting a felony had been committed as justified and required him to make the arrest. There were ample grounds for so believing. Regardless of *when* the actual arrest took place—that fact is unimportant in this case—the officer had been informed *before* he signaled the operator of the Buick automobile to stop that a safe had been stolen from a warehouse, that more than one

person was involved in the theft, that three of the suspects were wearing coats or jackets of different colors of which he had a description, and that a two-tone blue and cream or white Buick had been seen in the vicinity of the burglarized warehouse from which the safe had been taken. We think there is no doubt that this information plus his own knowledge of the probable owner of the automobile were reasonable grounds for the arresting officer to believe that a felony had been committed and that the defendants were the felons. *Brinegar v. United States, supra*.[1] Although the past record of one of the suspects standing alone would not have been a reasonable ground for belief in his guilt, it is clear that in determining whether there was probable cause for an arrest it was not improper for the arresting officer to take into account and give reasonable weight to the past conduct, character and reputation of the suspect, along with the other cogent factors of which he had been informed with respect to the burglary and theft. *Ellison v. United States,* 206 F. 2d 476 (D. C. Cir. 1953) ; *United States v. Hayden,* 140 F. Supp. 429 (D. C. Md. 1956) ; *Price v. United States,* 119 A. 2d 718 (D. C. Mun. App. 1956). See also 6 C.J.S., *Arrest,* § 6d (2) (c).

Since the arrests were lawful, it follows that the search of the Buick automobile and seizure of the burglary tools and clothing were likewise lawful. Of course, as was said in *United States v. Di Re,* 332 U. S. 581, 595 (1948): "[A] search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success." But in this instance the search was good when it started and it was still good when it turned up the burglary tools and clothing from which the flecks of incriminating paint were taken.

While the Bouse Act [Code (1957), Art. 35, § 5], does prohibit the use of evidence in the trial of certain misdemean-

---

1. The cases cited by the defendants to support their contention that there was no probable cause for making the arrest, such as *Hanna v. United States,* 260 F. 2d 723 (1958), *United States v. Di Re, infra,* and *Henry v. United States,* 361 U. S. 98 (1959), are clearly distinguishable on the facts.

ors—such as the breaking of the warehouse, of which, and only of which, the defendants were found guilty—when it is procured as a consequence of an illegal search and seizure, it was not improper in this case to use such evidence as was afforded by the seizure of the burglary tools and clothing since the defendants were also charged in the same indictment with statutory grand larceny of the safe and its contents, which was a felony. Evidence obtained as an incident of a lawful arrest is admissible in every case in which it is relevant. Indeed, even if the defendants had been separately indicted for each charge or had been indicted only for breaking the warehouse [a misdemeanor] and not statutory grand larceny [a felony], that fact would not have prohibited use of the evidence to which the defendants objected. *Freedman v. State, supra.* This is so because there is nothing in Art. 35, § 5, *supra,* which prohibits the admission of evidence obtained by a search which was lawful at the time it was made. To be lawful, of course, there must have been reasonable grounds for the arresting officer to believe that a felony had been committed by the persons arrested. We hold that admission of the burglary tools and the oral testimony incident thereto as evidence against all of the defendants was proper. Indeed, neither Stein nor Mulcahy had any reason to complain of an illegal search of either of the automobiles or the McClelland home and the consequent seizure of the burglary tools, the Chrysler title and the stolen safe since they neither owned, controlled nor had any interest in the premises or vehicles searched. *Frank v. State,* 189 Md. 591, 56 A. 2d 810 (1948). We further hold that the admission of the results of the analyses of the clothing of McClelland and Stein was also proper.

(ii). Admissibility of Other Evidence.

This question affects only McClelland. It concerns the admission into evidence of the automobile title and photographs of the purloined safe and the oral testimony relating to both articles. Obviously, the question presents a different problem from that posed by the admission into evidence of the burglary tools and clothing. Since it is apparent that

neither the title nor the safe was in the *presence or immediate possession* of McClelland at the time of his arrest, there is no doubt that his home and Chrysler automobile parked in the rear thereof should not have been searched without a warrant. Cf. *Callahan v. State, supra.* But the problem here is not the illegality of the search and seizure. Instead, the question is whether evidence concerning the illegally seized articles was properly admitted under the circumstances in this case. We think it was.

In the instant case the defendants (including McClelland) were indicted for a felony [statutory grand larceny] as well as a misdemeanor [statutory burglary], however, McClelland seemingly overlooked that fact in interposing his objections to the evidence concerning the illegally seized title and safe. It is true, of course, that he seasonably moved to suppress all evidence which had been unlawfully obtained, that he objected —for the same reason on which the motion was based—when the first photograph of the safe was offered and admitted, and that he renewed the motion to suppress at the conclusion of the state's case,[2] but, in so doing, he neither informed the court that his objections were limited to or primarily aimed at the admissibility of the evidence under the misdemeanor count, nor, which would have been more effective, did he request the trial court to instruct the jury that such evidence could be considered only on the felony charge and not on the misdemeanor charge. In short, we think the motions and objections which were made were too broad to entitle McClelland to a review of this question on appeal. While what was done may have met the requirements of Maryland Rule 522 in that it was sufficient to constitute a general objection to the admissibility of the evidence claimed to have been unlawfully

---

2. Under similar circumstances in *Asner v. State,* 193 Md. 68, 65 A. 2d 881 (1949), in which the defendant was indicted for a misdemeanor, it was held—the question having been raised by a motion to quash a search warrant and by a specific objection to the same evidence which came in later without objection—that it was not necessary to object to subsequently asked questions or to the introduction of evidence concerning what had been found as a result of the search and seizure.

obtained, it was also necessary—in a case such as this where the evidence was properly admissible on the felony charge— to make known to the court the desire of the objector to limit such evidence to that charge in order to entitle the defendant to a review of the alleged error in this Court. Ordinarily, an error in the general admission of evidence which is proper only for a particular purpose cannot be urged on appeal unless its admission for another purpose was properly excepted to in the trial court either by way of an objection, a motion or other appropriate action to have it so limited. 4 C.J.S., *Appeal & Error,* § 290 b (3). Since the unlawfully obtained evidence was admissible under the felony count in the indictment, the jury could consider it in relation to the misdemeanor count in the absence of some specific action on the part of the defendant to limit its use. This Court so held in *Debinski v. State,* 194 Md. 355, 361, 71 A. 2d 460, 463 (1950). See also *Lawrence v. State,* 103 Md. 17, 63 Atl. 96 (1906). We have repeatedly held—since the enactment of the Bouse Act [3]—that evidence, if otherwise admissible, even though illegally obtained, was admissible in a prosecution for a felony. *Barker v. Warden,* 208 Md. 662, 119 A. 2d 710 (1956); *Salsburg v. State,* 201 Md. 212, 94 A. 2d 280 (1953), *aff'd sub nom. Salsburg v. State of Maryland,* 346 U. S. 545 (1954); *Marshall v. State,* 182 Md. 379, 35 A. 2d 115 (1943). See also *Givner v. State,* 210 Md. 484, 124 A. 2d 764 (1956); *Delnegro v. State,* 198 Md. 80, 81 A. 2d 241 (1951), [holding stated but not applied in these two cases where the offenses charged were misdemeanors].

### (iii). Sufficiency of Corroboration.

This third question concerns only Mulcahy. His motion for a directed verdict of not guilty—on the ground that the testimony of the accomplice [Gatton] had not been corroborated—was properly refused by the trial court. Recently, in the case of *Wright v. State,* 219 Md. 643, 150 A. 2d 733 (1959), we had occasion to review and restate the rule per-

---

3. The Bouse Act changed the rule only in prosecutions for misdemeanors.

taining to the degree of corroboration required to strengthen the probative and criminative force of the testimony of an accomplice as to "some of the material points involved," which is all that is required. There we said at p. 650:

> "[I]t still appears that not much in the way of corroboration is required and that it is not necessary in and of itself for the corroborative evidence to be sufficient to convict, yet the corroborative evidence must support the testimony of the accomplice as to some of the material facts tending to show that the accused was either *identified with* the perpetrators of the crime or had *participated in* the commission of the crime itself." (Emphasis added.)

See also 7 Wigmore, *Evidence,* § 2059c (3rd ed. 1940).

Since the sufficiency of corroboration must depend upon the facts and circumstances, and the inferences deducible therefrom, in each case, the question is whether there was evidence in the record, which, with some degree of cogency, tended to establish material and relevant facts sufficient to authorize the jury to give credit to the testimony of the accomplice. We think there was such evidence. While it was true that neither the eye-witness nor the police officer was able to identify Mulcahy as one of the persons at the scene of the burglary, and while it was also true that the analysis of his clothing failed to disclose any particles of paint such as had been found on the clothing of McClelland and Stein, there was other evidence or deducible inferences which were sufficient to corroborate the testimony of the accomplice. Mulcahy's own statement to the police immediately after his arrest—to the effect that he had been drinking with the other defendants and the accomplice in a tavern, that they left the first one and went to another next door, that after leaving the last one visited they had driven around for awhile, and that they were going to get something to eat when they were picked up by the police, even though he changed his story at the trial to break the continuity of the association—tended to corroborate his presence at the scene of the crime in that he had been with the other three immediately before and immediately after

the burglary—an interim of less than thirteen minutes. The unobjected to oral statements of McClelland and Stein were to the same effect and also tended to be corroborative. And there was corroboration in the fact that Mulcahy was wearing a brown topcoat when arrested as one of the suspects was reported to have been wearing at the scene of the crime.

There was also the fact that the testimony of the non-accomplice witnesses was consistent with that of the accomplice and inconsistent with that of Mulcahy. *Wright v. State, supra.* Furthermore, as we said in the *Wright* case [at p. 652] : "corroboration of a material point tending to connect the accused with the crime is sufficient for a jury to infer that the accomplice had testified truthfully even with respect to matters as to which there had been no corroboration."

We hold that the testimony of the accomplice was sufficiently corroborated to warrant submission of Mulcahy's case to the jury. The weight of the evidence and the credibility of the witnesses was for the jury to determine. Rule 739 c.

The judgments will be affirmed.

*Judgments affirmed.*