## GRAHAM *v.* STATE

[No. 358, September Term, 1964.]

522

*Decided July 28, 1965.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, HORNEY, SYBERT and BARNES, JJ.

*Hamilton P. Fox, Jr.,* for the appellant.

*Richard M. Pollitt, Special Attorney,* with whom were *Thomas B. Finan, Attorney General, W. Ross Hockersmith, State's Attorney for Worcester County,* and *Alfred T. Truitt, Jr., State's Attorney for Wicomico County,* on the brief, for the appellee.

BARNES, J., delivered the opinion of the Court.

The appellant, Henry Graham, defendant below, was convicted

by a jury in Wicomico County of murder in the first degree without capital punishment and sentenced by the trial court to life imprisonment. He raises two questions on appeal in regard to evidence admitted against him at the trial: 1) Did the officers who arrested the defendant have probable cause for arresting him, so as to permit the introduction into evidence of a pistol procured as a result of the search made of the defendant's home at the time of his arrest? 2) Did the State show a sufficient connection between the defendant and the plaster impression of a shoeprint introduced into evidence so as to permit the introduction of the plaster mold into evidence?

We have concluded that both questions must be answered in the affirmative.

## I.

The facts in regard to the first question are as follows:

The body of Zadok Henry, the murdered man, was discovered on January 31, 1964 in the rear of his second-hand furniture store in Berlin, Worcester County, Maryland.[1] The Deputy Medical Examiner, who examined the body at 11:30 A.M. estimated that the victim had been dead for approximately twelve hours or more. The victim was 76 years of age. There were four gunshot wounds in the body, three in the chest and one in the neck, at least one of which was fatal. These bullets were removed from the body by the Deputy Medical Examiner and turned over to the State Police. The State Police expert, Sergeant John S. Sawa, found that these bullets were Remington golden .22 caliber bullets, and were fired from one of five different type weapons. One of the five weapons was a "Rohm" .22 caliber, double action revolver.

The police officers in charge of investigating the murder were notified that they should look for weapons of these five types. On February 2, 1964, Deputy Sheriff Rhem Lane of Worcester County talked with Allen .Benjamin Moore for the purpose of checking a "Rohm" .22 caliber pistol owned and registered by

---

1. The trial was removed from Worcester County at the request of counsel for the defendant and was held in the Circuit Court for Wicomico County.

Moore. Later, on February 7, 1964, at about 3:30 P.M., Deputy Sheriff Lane talked with Moore who then told the Deputy Sheriff that the defendant had a pistol "exactly like his." Moore also stated that the defendant had visited Moore's home between February 2nd and February 7th and that the defendant had in his possession a pistol "exactly like his"; that he had seen the defendant loading this pistol; that the defendant wanted to stay with Moore, but when advised by Moore that the police came to Moore's home regularly to check up on him, the defendant stated, "Well, I can't stay here then" and "if they take me, they have to take me dead"; that the defendant was hiding in the woods during the day time and was coming home at night to a shack across the road from the house in which the defendant's wife and children lived. The Deputy Sheriff knew that the weapon which Moore described was of the type being sought by the police in connection with the murder.

The defendant's home was within three and one-half miles of the place of the murder.

Acting upon the information obtained from Moore, the Deputy Sheriff gathered several other officers and went to the defendant's home that night. At 12:50 A.M. they arrived at the defendant's home. The door was bolted with a padlock on it and, on the door was a note which read: "Have gone to Salisbury Be back tomorrow" and signed "Christine." The first name of the defendant's wife was "Christine." The officers then went across the road to the small shack and tried to get in, but could not. While making one last search around the back of the shack, the Deputy Sheriff saw the defendant push up a window (the Deputy Sheriff thought the defendant was trying to get out of the window), and after the Deputy Sheriff called to the other officers, the window was closed and the officers surrounded the building. They then entered the building. The defendant and his wife were there. The defendant was crouched down in the corner of the room with the Rohm .22 caliber pistol in his hand. When the officers entered he arose and dropped the pistol into a washing machine, from which it was recovered by the officers. No warrant for the defendant's arrest had been obtained by the officers for the murder, although there were

outstanding warrants against the defendant for violation of the motor vehicle laws in failing to have tags on his motor vehicle. The testimony of the officers indicated that they arrested the defendant for the murder and not for the motor vehicle law violation. The State Police expert was of the opinion and testified that the bullets recovered from the victim's body were fired from the Rohm .22 caliber pistol recovered from the washing machine and the trial court, over objection of the defendant's counsel, admitted the pistol into evidence against the defendant.

In the case at bar, the information upon which the police acted was fully developed in the evidence. Cf. *Farrow v. State,* 233 Md. 526, 197 A. 2d 434 (1964). The existence of probable cause justifying an arrest without a warrant depends upon the facts and circumstances in each particular case.

Judge Horney, for the Court, stated in *Mulcahy v. State,* 221 Md. 413, at 422, 158 A. 2d 80 (1960) :

> "* * * [T]he substance of all definitions of 'probable cause' is a reasonable ground for believing that the person about to be arrested is guilty and that 'probable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.' Moreover, where circumstances make an arrest without a warrant lawful, it is permissible, as an incident to the arrest, to search the person of the suspect and to take into custody and examine the tangible evidence or instruments of the crime, whether upon his person or within his present or immediate possession. *Callahan v. State,* 163 Md. 298, 162 Atl. 856 (1932) ; *Carroll v. United States,* 267 U. S. 132 (1925)."

See also 5 Am. Jur. 2d "Arrest," Section 48, where it is stated :

> "The existence of 'probable cause', justifying an arrest without a warrant is determined by factual and

> practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. It is a pragmatic question to be determined in each case in the light of the particular circumstances and the particular offense involved."

As pointed out by the Supreme Court of the United States in *Brinegar v. United States,* 338 U. S. 160, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949), citizens must be protected from unreasonable invasions of privacy and from unfounded charges of crime, but, on the other hand, police officers must have reasonable leeway for enforcing the law and protecting the community from criminal behavior. The rule of "probable cause"— a non-technical conception of a reasonable ground for belief of guilt, requiring less evidence for such a belief than would justify conviction but more evidence than that which would arouse a mere suspicion—is the best compromise between these two important considerations of public policy.

In the present case, the police officers at the time of the arrest *knew that a felony had been committed.* This arrest was not made upon mere suspicion that a felony might have been committed. See *Capparella v. State,* 235 Md. 204, 208, 201 A. 2d 362, 364 (1964) and *Young v. State,* 234 Md. 125, 129, 198 A. 2d 91, 93 (1964).

In addition to the knowledge that a felony had been committed, the arresting police officer knew the following: The police expert had determined that the bullets causing the victim's death were fired from one of five type weapons, one of which was a "Rohm" .22 caliber pistol. Moore had a pistol of this type and the defendant had one "exactly like his." The defendant had stated to Moore [2] that he (the defendant) could not stay with Moore if the police came there; that the defendant was hiding in the woods during the day time; and that if the defendant were apprehended by the police, "they have to take me dead." The defendant lived within three and one-half miles

---

2. Information received from a third person may form the basis for a reasonable belief by the arresting officer that the defendant committed the felony. Shorey v. State, 227 Md. 385, 177 A. 2d 245 (1962). See Mulcahy v. State, 221 Md. 413, 158 A. 2d 80 (1960).

of the place where the crime was committed. When investigating the shack, the defendant raised a window and appeared to the Deputy Sheriff to attempt to escape through it. After hearing the Deputy Sheriff's call to the other officers, the window was closed.

The statements made by the defendant and his conduct reasonably indicated a far more serious situation than a mere violation of the motor vehicle laws, and the arresting officers had probable cause to believe that the defendant had committed the felony of which they already had knowledge.

The defendant complains that the arresting officers did not obtain a warrant although they had time to do this. The record does not clearly establish that they did have sufficient time to obtain a warrant, but assuming, without deciding, that they did have sufficient time, this is not material in the case at bar. It is well established that if the arresting officers had reasonable grounds to believe that the defendant had committed the felony, it was not necessary that they obtain a warrant merely because they had sufficient time within which to do this. *Mills v. United States,* 196 F. 2d 600, 602 (1952, U. S. C. of Ap. D.C.) cert. den. 344 U. S. 826, 73 S. Ct. 27, 97 L. Ed. 643 (1952). See also *Reeves v. Warden,* 226 F. Supp. 953, 957 (1964, U. S. D. Ct., Md.).

## II.

In regard to the second question, the facts are as follows:

Sergeant Robert D. Weir, Supervisor of Criminal Investigation of the Maryland State Police in Salisbury, Maryland, with Trooper Chaffey arrived at the scene of the crime on January 31, 1964. They observed a number of footprints of various shapes and sizes near the Henry home and second-hand furniture store. On the south there was a path leading from the south end of the building toward the road. This path was apparently used frequently. On this path, approximately 30 feet from the building, Sergeant Weir and Sheriff Tyler covered several footprints with tin and other materials in order to preserve them. It appeared that it might rain that day. Later on January 31st, State Trooper Gary Coonradt, the police expert in identification in footprints, shoes, heels and tire impressions,

and a police photographer, arrived at the Henry home. The footprints, which had been covered with tin and other materials, were shown the officers and photographs of the prints were then taken after they were uncovered. It was "misting and starting to rain" and it was thought that the pictures should be taken forthwith as they might be spoiled by the rain. The footprint in question was 30 feet from the corner of the building and the point of the shoe pointed towards the building. The following day at approximately 1:30 P.M., State Trooper Coonradt poured plaster on the print which had theretofore been covered with a piece of tin, which had been removed and replaced after the photograph was taken on January 31st.

After the plaster impression had been removed and the sticks, grass and like debris removed, the defendant was requested on February 8th, to give Trooper Coonradt a pair of his shoes. The defendant willingly did this. After careful examination, Trooper Coonradt concluded that the plaster cast was the impression of a man's left shoe and that it was a heel impression characteristic of a deluxe Cat's Paw type heel, size 11-12. It was the type of Cat's Paw heel made in Baltimore. There are Japanese imitations of these heels and it is often difficult to tell the imitation from the heel manufactured in the United States. The defendant's shoes were received into evidence. The comparison of the left shoe of the defendant with the plaster cast disclosed that they were similar in size, manufacture, design and contour. A nick in the left heel of the defendant's shoe also appeared in the impression in the plaster cast. Trooper Coonradt explained that in mud, the impression would be smaller than the actual shoe, but in sand it would appear larger. The footprint in question had been made in mud.

In our opinion, the trial court properly admitted the defendant's shoes and the plaster cast of the footprint into evidence. Trooper Coonradt's testimony was sufficient to support a determination by the jury that the footprint was made by the defendant. He explained away any differences between the footprint and the defendant's left shoe. The chain of custody was fully established. The defendant's objections go to the weight of this evidence rather than to its admissibility. See *Breeding v.*

*State,* 220 Md. 193, 199, 151 A. 2d 743, 747 (1959). *Lingner v. State,* 199 Md. 503, 507, 86 A. 2d 888, 890 (1952).

It is now well established that the correspondence of footprints found in connection with a crime with the print made by the shoe of the accused, is admissible in evidence to identify the accused as the guilty person. *People v. Hanson,* 31 Ill. 2d 31, 198 N. E. 2d 815 (1964) ; *State v. Mihoy,* 98 N. H. 38, 93 A. 2d 661 (1953) ; *State v. Ragland,* 227 N. C. 162, 41 S. E. 2d 285 (1947). See the annotation *"Footprints as Evidence"* 31 A.L.R. 204 and cases cited at pages 217-218 and 219-220, and 22 A C.J.S. *"Criminal Law,"* Sec. 616 b (3) page 430, and cases cited in Note 43.

Since we find no error in the two rulings on the evidence by the trial court presented by this appeal, the judgment will be affirmed.

*Judgment affirmed.*