Phillip SHOREY, Appellant,

v.

**WARDEN, MARYLAND STATE PENITENTIARY, Appellee.**

No. 11128.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 2, 1967.

Decided Jan. 18, 1968.

Fred E. Weisgal, Baltimore, Md. (court-assigned counsel), for appellant.

Fred Oken, Asst. Atty. Gen. of Maryland (Francis B. Burch, Atty. Gen. of Maryland, on the brief), for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and BUTZNER, Circuit Judges.

BUTZNER, Circuit Judge:

The District Court for the District of Maryland denied Phillip Shorey's petition for a writ of habeas corpus after a plenary hearing. Shorey was sentenced to death on June 7, 1961, upon the verdict of a jury of the Criminal Court of Baltimore City convicting him of rape and burglary. His conviction was affirmed on appeal, Shorey v. State, 227 Md. 385, 177 A.2d 245 (1962), cert. den., 371 U.S. 928, 83 S.Ct. 297, 9 L.Ed.2d 235 (1962), and he was denied relief in state post-conviction proceedings, Shorey v. Warden, 229 Md. 620, 182 A.2d 47 (1962) (per curiam), and Shorey v. Warden, 240 Md. 735, 215 A.2d 476 (1966) (per curiam). This appeal involves the legality of Shorey's arrest, the seizure of his clothing, and the admissibility of his inculpatory statement to the police. We affirm the District Court.

A 77-year old woman was raped and injured in the bedroom of her home in Baltimore about 2:30 A.M. on May 28, 1960. Due to her condition and to the fact that the room was dark, she was unable to identify her assailant and she was uncertain of his age. She did, however, provide some clues. She told Sergeant John Nagle and other investigators that he was a Negro wearing a white shirt and tan pants. She also said he wore a strap on his wrist. Later the same day—at about 11 P.M.—Sergeant Nagle was informed by Officer Santavasci that he had previously arrested Shorey in connection with a "peeping Tom" offense and that Shorey lived with his sister and her husband in the same block as the victim.

About 2:30 A.M. on May 29, 1960, Sergeant Nagle and another policeman went to the home of Shorey's sister, Mrs. Armistella Dorsey, to question Shorey. As a matter of routine precaution, Sergeant Nagle had another police unit stationed at the rear of the house.

Sergeant Nagle's testimony differed from Mrs. Dorsey's. The district judge accepted the sergeant's testimony and specifically found that Mrs. Dorsey was not a credible witness. In weighing the evidence the district judge considered not only the testimony at the plenary hearing, but he also examined the transcript of the criminal trial and considered the findings of the court in Shorey's Maryland post-conviction hearing, which were a part of the record before him.

The district judge found that Mrs. Dorsey voluntarily admitted the two police officers to her house and authorized them to go to the cellar to see her brother, who was sleeping there on a cot. The cellar was not set apart for Shorey's exclusive use.

The officers found Shorey lying on an army cot. He had a strap on his wrist. A white shirt and a pair of gray pants, both stained with blood, hung on a chair in plain view two or three feet from the cot. Sergeant Nagle asked about the

stains and Shorey responded, "I do not know where I got them—I must have messed with someone." The officers arrested Shorey and seized his clothing.

## I.

■ Shorey's clothing was admitted into evidence. It was vital to the state's case. The pants contained spermatozoa and were stained with blood of a type similar to the victim's. The exclusionary rule of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), was applicable to his trial, Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). The propriety of the seizure is governed by federal constitutional standards. Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). The officers had no search warrant, so the legality of the seizure depends upon the lawfulness of Shorey's arrest.

■ Under the Maryland law an arrest is the detention of the accused with the intention to prosecute him for a crime. The detention occurs when the officer restrains the accused or otherwise gives him to understand that he is under arrest and he submits. Duffy v. State, 243 Md. 425, 431, 221 A.2d 653, 656 (1966). The Maryland rule does not differ substantially from the federal rule which prescribes that the arrest occurs when the police restrict the accused's liberty of movement. Henry v. United States, 361 U.S. 98, 103, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); United States v. Gearhart, 326 F.2d 412, 414 (4th Cir. 1964).

■ In the absence of an arrest warrant, the validity of the arrest depends on whether officers had knowledge or reasonably trustworthy information sufficient to cause a prudent man to believe that a felony had been committed and that the accused committed it. Graham v. State, 239 Md. 521, 212 A.2d 287 (1965). The Maryland rule satisfies the requirements of the United States Constitution. Cf. Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

Our inquiry focuses on two issues: first, when did the police arrest Shorey, and second, whether at the moment of arrest, the police had probable cause to arrest him.

The district judge found upon ample evidence that when the officers came to the house where Shorey was asleep they intended to question him as a suspect; they did not intend to arrest him unless the questioning developed more evidence than they then had. He also found they did not arrest Shorey until after they saw his bloodstained clothing.

In Ralph v. Pepersack, 335 F.2d 128, 132 (4th Cir., 1964), cert. den., 380 U.S. 925, 85 S.Ct. 907, 13 L.Ed.2d 811 (1965), this court, in reviewing cases that define probable cause for arrest, said:

"The existence of 'probable cause' is to be determined by the application of a practical, not a technical, standard. * * * Probable cause is something more than mere suspicion and something less than evidence which would justify a conviction. The essence of all definitions of probable cause for arrest is reasonable ground for belief that a crime has been committed and that the person arrested committed it. * * * However, in determining the existence of probable cause a standard is much more easily stated than applied. No single litmus-paper test will provide the answer when probable cause is at issue; we look instead to the totality of the circumstances. And the pertinent circumstances are those of the moment, the actual ones, the ones that confronted the arresting officers. * * * Our inquiry is whether their action was that of reasonable and prudent police officers in view of the circumstances as they appeared at the time of arrest."

■ The elderly woman who had been raped reported her assailant was a Negro wearing a wrist strap. In addition to this, the police knew the victim had bled profusely, and they reasoned that the

assailant's clothes would bear blood stains. Before the police arrested Shorey they knew he was a Negro living in the same neighborhood as the victim and that he was suspected of being a "peeping Tom." They saw that he wore a wrist strap and his clothing was blood-stained. The facts which the officers knew about the assailant and the facts which they knew and observed about Shorey were more than mere coincidence leading to a bare suspicion. They were facts and circumstances sufficient in themselves to warrant the belief of a man of reasonable caution that Shorey had committed the offense. The officers had probable cause to arrest Shorey.

■ We reject Shorey's argument that he was arrested before the officers had probable cause. He urges us to hold that his arrest occurred when the police officers were stationed at the rear of the house where he slept and other officers entered the house. The acts of the police at this time did not amount to an arrest. The police car at the rear of the house was a precautionary measure. It had no coercive effect upon either Shorey or his sister. Neither of them knew it was there. The officers who entered the house did not intend to arrest Shorey at the time of entry. Their purpose then was to question him. The police sergeant who arrested Shorey testified the arrest was made after the police saw Shorey and his bloody clothing.

■ The district court's conclusion that Shorey was arrested upon probable cause after the officers saw the blood-stained clothing is not erroneous as a matter of law. The factual findings upon which it is based are amply supported by the evidence and are binding upon us. Fed.R.Civ.P. 52(a).

## II.

■ We also reject Shorey's contention that even if the officers arrested him after they saw his clothing, their entry about 3 A.M. without either a search warrant or his consent constituted an illegal search. Sergeant Nagle had been assigned to investigate the crime. He had talked with the victim and inspected her home. He was familiar with the background of the complaint, but he knew nothing about Shorey. Not until he came on duty at 11 P.M., May 28, did he learn from Officer Santavasci that Shorey had previously been arrested as a "peeping Tom" and that he lived in the same block as the victim. Sergeant Nagle arrived at the house where Shorey slept between 2:30 and 3 A.M., May 29. Shorey himself did not arrive home until about 2 A.M., and he had gone to bed only a few minutes before the police came.

■ Sergeant Nagle acted with reasonable promptness after he learned about Shorey. There was nothing sinister or improper in his decision to check the lead provided by Officer Santavasci before he went off duty the next morning. The fact that he sought Shorey in the early morning did not make his entry constitutionally objectionable. Shorey's sister, an occupant of the house, consented to the entry of the police and permitted them to go to the cellar. The police were not uninvited intruders. For this reason Shorey's Fourth Amendment rights were not violated by the officers' presence. Cf. McDonald v. United States, 335 U.S. 451, 457, 69 S.Ct. 191, 93 L.Ed. 153 (1948) (concurring opinion).

■ Shorey's counsel correctly points out that Mrs. Dorsey could not consent to a search of the premises which were assigned to Shorey's exclusive use. Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); Reeves v. Warden, 346 F.2d 915 (4th Cir. 1965). The chief difficulty with this argument (aside from his non-exclusive use of the cellar) is the fact that the officers conducted no search. They went to the cellar to interrogate Shorey. The strap on his wrist and his bloodstained clothing were in plain view. The officers saw them without the necessity of making a search. We have previously said, "It is well established that it is not a search to observe what is open and patent either in daylight or in artificial light." Petteway

v. United States, 261 F.2d 53, 54 (4th Cir. 1958). Cf. Ker v. California, 374 U.S. 23, 43, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); United States v. Barone, 330 F.2d 543, 544 (2d Cir. 1964), cert. den., 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053 (1964).

The material facts of this case do not substantially differ from those found in Davis v. United States, 327 F.2d 301 (9th Cir. 1964), where officers, intent upon questioning the defendant about narcotics, were invited into his home during the day by his eight-year old daughter. The officers saw marijuana in plain view near the doorway and in a bathroom which one of the officers used. They arrested the defendant who was in bed at the time of their visit. The court held the entry was legal, the evidence in plain view was not obtained by search, the arrest without a warrant was valid, and the marijuana was admissible in evidence.

We hold that the seizure of Shorey's clothing was not unreasonable. It was an incident to his lawful arrest. The clothing was admissible in evidence. Agnello v. United States, 269 U.S. 20, 46 S. Ct. 4, 70 L.Ed. 145 (1925). Cf. Warden, v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); Leek v. State, 353 F.2d 526 (4th Cir. 1965).

### III.

█ Finally, we consider Shorey's contention that his statement was involuntary and should not have been admitted into evidence. Following his arrest, Shorey was booked at a police station in Baltimore at 3:10 A.M. He remained in his cell until about 4:45 A.M., when he was questioned until 7 A.M. Some of the questioning during this time took place while the officers accompanied Shorey on a fruitless trip to St. James Street, Baltimore, to check out an alibi. He had breakfast between 7 and 8 o'clock and was questioned from 8 o'clock until noon. Shorey was then given lunch and was not questioned again until 1:15 P.M. At approximately 1:45 P.M. he made his oral statement, which was reduced to writing at 2:30 and completed at 3:45

P.M. Shorey did not admit the rape or the burglary, although he did admit being in the victim's house on the morning that she was raped. His statement is inculpatory and its admission is governed by rules pertaining to confessions.

Shorey, in addition to complaining of the time of the arrest and the hours of questioning, relies on specific instances of coercion. He claims a table was pushed into his stomach, a police finger was poked in his eye, and he was threatened that he would be "worked over." He testified he was kept awake until the afternoon of May 30, when he signed a statement made up by the police.

Shorey's testimony about his statement was introduced during his criminal trial. He did not present additional testimony on this issue at his habeas corpus hearing. The state trial judge thoroughly examined the circumstances of Shorey's statement in the absence of the jury. The police testified that no force, threats, or intimidation were used against him. Shorey's specific charges of coercion and mistreatment were specifically denied. The police testified he was not kept awake until the afternoon of May 30, but, on the contrary, he gave his statement on May 29. After the state trial judge ruled Shorey's statement was voluntary, it was exhaustively tested before the jury under proper instructions.

█ The test of the admissibility of Shorey's statement is voluntariness. Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). The requirements of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Escobedo v. Illinois, 378 U.S. 478 (1964), are not applicable to Shorey's 1961 trial. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). To be admissible the statement must have been "the product of an essentially free and unconstrained choice." Smallwood v. Warden, 367 F.2d 945, 949 (4th Cir. 1966), cert. den., 386 U.S. 1022, 87 S.Ct. 1374, 18 L. Ed.2d 460 (1967). The question is "whether the defendant's will was overborne at the time he confessed."

Lynumn v. Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963).

We have found that Shorey's arrest was lawful. The fact that it occurred in the early morning hours did not render it constitutionally impermissible. Shorey was questioned for about six hours in an 11-hour period before he made a verbal statement. During this period he was given breakfast and lunch and allowed at least an hour to eat each meal. The time required for the questioning was not unreasonable. Ralph v. Pepersack, 335 F.2d 128, 140 (4th Cir. 1964), cert. den., 380 U.S. 925, 85 S.Ct. 907, 13 L.Ed.2d 811 (1965).

Shorey was 23 years old. He had the equivalent of a high school education. No mental deficiency is evident or claimed. The conflict of his testimony with that of his interrogators presented an issue of fact that was resolved against him by both the trial judge and the jury. We agree with the district judge that "Shorey's will was not overborne by physical or psychological pressures at the time he gave his statement." Shorey's statement was admissible.

The judgment of the district court denying the writ of habeas corpus is

Affirmed.