550 A.2d 925

Najee Shadeed Abdul ALI a/k/a William Thompson

v.

STATE of Maryland.

No. 106, Sept. Term, 1986.

Court of Appeals of Maryland.

Dec. 7, 1988.

Melissa M. Moore, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief) Baltimore, for appellant.

Valerie V. Cloutier, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on the brief) Baltimore, for appellee.

Argued Before ELDRIDGE, COLE, RODOWSKY, COUCH * and McAULIFFE, JJ., and MARVIN H. SMITH and CHARLES E. ORTH, Jr., Associate Judges of the Court of Appeals of Maryland (retired), Specially Assigned.

McAULIFFE, Judge.

The extraordinary survival of one of two intended victims of a planned execution-style murder provided the State with eyewitness testimony implicating the Petitioner, Najee Shadeed Abdul Ali. Upon this and other evidence, Ali was convicted of murder, kidnapping, and related offenses, and sentenced to imprisonment for life plus twenty-five years. He appealed to the Court of Special Appeals, challenging two evidentiary rulings—the first dealing with the exclusion

---

* Couch, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

of a police report, and the second dealing with the admission of expert testimony. The Court of Special Appeals affirmed, *Ali v. State*, 67 Md.App. 339, 507 A.2d 648 (1986), and we granted certiorari. We affirm, but, with respect to the first question, on grounds different than those relied upon by the Court of Special Appeals.

## I.

### Facts

During the early morning hours of June 3, 1981, Tyrone Harrell (Tyrone) and one or two accomplices drove or escorted Marvin Brown and Debbie Rae McNally Waligora to the area of Forge Road and Belair Road in Baltimore County, for the purpose of killing one or both of them. Brown was shot twice in the head, and killed. Waligora ran when she saw Brown shot. As she ran, she was shot once in each arm, knocking her to the ground. She was then shot three times in the chest and once in the back of the head. She lost consciousness, and the perpetrators left the scene. Upon regaining consciousness, Waligora was able to drag herself to the shoulder of Forge Road, where she was seen by a passing motorist.

Waligora was able to tell police who responded to the scene that Tyrone had shot Brown and her, and she was able to give them Tyrone's address. The police placed an immediate surveillance on Tyrone's home, and within hours of the shooting observed Ali and another male depart from the rear of the home. They also observed Robert Harrell (Robert), Tyrone's brother, carry a small trash can from the residence and discard it in a nearby dumpster. The police recovered the can, and found it to contain two handguns, bullets, spent shell casings, gloves, and a Crown Royal drawstring bag. One gun was a .38 caliber Derringer, and the other was a .25 caliber semi-automatic pistol. The .25 caliber pistol was later identified as the weapon that fired a bullet which was removed from Waligora, and was also identified as the weapon that had ejected shell casings

found at the scene of the shootings.[1] Tyrone was arrested at his home. Ali, who took up residence in Louisiana under an assumed name shortly after these events, was found and arrested in 1985.

At Ali's trial, the issue was criminal agency. There was no dispute that Brown had been murdered and Waligora criminally assaulted—the question was whether Ali had been involved. Both sides agreed that Tyrone had been a principal actor in the shootings.[2] The State contended that Ali was also a principal participant, having accompanied Tyrone and another to the place of the shooting and having assisted in the actual and attempted executions. Ali admitted having been present at Tyrone's home on the day of the shootings, but denied any involvement in, or advance knowledge of, the criminal events.

The State's principal witness was Waligora, who testified to the following facts. She and Brown had been visiting at Tyrone's home with Tyrone, Ali, and another male known to her only as Leroy, when initially cordial relations turned sour.[3] Brown was beaten, after which Brown and Waligora were strip-searched and held captive. Tyrone gave rubber gloves to Ali and Leroy, placed a pistol in a Crown Royal bag, and told the others that Brown had to be taught a lesson. Leroy forced Brown to drive to the scene of the shooting in Brown's car, while Tyrone and Ali escorted Waligora in a white Lincoln. When they arrived, Waligora was taken to Brown's car, where Tyrone shot Brown. When Waligora bolted and ran, she was shot.

---

1. Brown was killed by .38 caliber bullets.

2. Tyrone Harrell was tried in 1984, and convicted of first degree murder and related offenses. He was sentenced to imprisonment for life plus 105 years.

3. Several possible reasons were offered for this turn of events: that Tyrone and his friends believed Waligora and Brown were police informants, trying to "set them up" through a purchase of drugs; that Brown had stolen, or attempted to steal, heroin which Tyrone had at his home; or, that Tyrone believed Waligora and Brown had earlier broken into Tyrone's home and stolen cameras from him.

Ali's version, on the other hand, was this. On the day before the shootings, Ali was with Tyrone, Brown, Waligora, and Edward Haskins at Tyrone's home. They were drinking and socializing, and at one point, Waligora was "selling sex" to the men for drugs. Ali went home at 5:00 p.m., but returned to Tyrone's home at 9:30 p.m., at Tyrone's request. Tyrone told Ali that Brown and Waligora had broken into Tyrone's home earlier, and had stolen personal property from him. Tyrone said he was going with Brown and Waligora to recover the property. Robert then arrived, and at 1:30 a.m. the next morning, the Harrell brothers left with Brown and Waligora. Tyrone and Robert returned about four hours later, placing guns, rubber gloves, and bullets on the table, and informing Ali that they "had to off" Brown and Waligora. When Tyrone saw the police establishing a surveillance around the home, Ali and Haskins left via the rear door because they did not wish to become involved.

Of the various persons alleged to have been present at Tyrone's home or at the scene of the shooting, only Waligora and Ali testified at trial. Because Waligora was the only witness who placed Ali at the scene of the shooting, impeachment of Waligora's testimony was an important objective for Ali. Moreover, it was to some extent an attainable objective.

At the time of this occurrence, Waligora was a stripper-dancer at several establishments on Baltimore City's "block." She admitted to a previous drug conviction, and said she was awaiting trial on several additional drug charges. She admitted she was attempting to buy drugs from Tyrone, but claimed she was doing so in an attempt to provide information for the police, and thus improve her own position with respect to her pending charges. She gave several statements to the police, including three separate statements to Officer Robert Ash on the first three days of her hospitalization. These statements were in part inconsistent with each other, and with Waligora's trial testimony, in details that ranged from the insignificant to the

substantial. Ali's efforts to demonstrate these inconsistencies produced the first evidentiary question, and the State's efforts to explain the inconsistencies produced the second.

## II.

The first evidentiary question involves, on its face, the business records exception to the hearsay rule, and the non-hearsay character of a prior inconsistent statement offered for impeachment. Lurking just beneath the surface, however, are more difficult questions involving the respective burdens of the party offering, and the party objecting to, a document admissible for a limited purpose but not admissible generally, and the function of the general objection as it may interact with those burdens.

In order to show that there were inconsistencies between several statements given by Waligora to the police, and to show that there were inconsistencies between her trial testimony and certain portions of her prior statements, Ali's attorney called Officer Ash as a defense witness.[4] Officer Ash testified that he had taken statements from Waligora on three occasions: on the day of the shooting, just after she had been transferred from the shock trauma unit to a hospital room, and on each of the two succeeding days, June 4 and 5, in her hospital room. In answer to defense counsel's questions, Officer Ash disclosed the details of the three statements, including each statement that the defense believed demonstrated an inconsistency.[5] Defense counsel then sought to introduce into evidence a supplemental police report prepared by Officer Ash on June

---

**4.** Defense counsel laid a proper foundation for the introduction of prior inconsistent statements during his cross-examination of Waligora.

**5.** Among the inconsistencies were these: on one occasion Waligora said that Leroy shot Brown, but on every other occasion she said Tyrone shot him; Waligora once said that she was taken to the scene in Brown's car, but on other occasions said she was taken there in the Lincoln; at one time she said the interior of the Lincoln was burgundy, and another time that it was black and white.

8, which reproduced the statements he had received from Waligora. The following colloquy ensued:

Defense Attorney: Your honor, I would like to enter this into evidence at this time.

Prosecutor: Objection, your honor.

The Court: Sustained.

Defense Attorney: Well, the jury has heard the testimony. No further questions.

The State does not question the adequacy of the foundation laid for admitting the report as a business record within the meaning of the Maryland business records statute, Maryland Code (1974, 1984 Repl.Vol.) § 10–101 of the Courts and Judicial Proceedings Article. *See Holcomb v. State,* 307 Md. 457, 515 A.2d 213 (1986). The State argues, however, that the statements made by Waligora to Officer Ash constitute second level hearsay, and are therefore inadmissible unless independently exempted from the operation of the hearsay rule by some other exception. The State is correct in its understanding of the law relating to business records, but incorrect concerning the existence in this case of an independent basis for the admissibility of Waligora's statements to the officer. We last stated the general rule in *Holcomb,* 307 Md. at 461–62, 515 A.2d 213:

In general, those portions of the report of a police investigation which record the facts obtained by the direct sense impressions of the investigating officer are admissible as a business record while those portions which report objectionable hearsay and opinions of the investigator are inadmissible as a business record.

Embraced within the concept of direct sense impressions is not only what the officer sees, but also what the officer may hear, feel, taste, or smell, and if such sensory observations are properly recorded in a business record, they may be admissible. If what the officer hears is a "fact," such as an audible warning heard at a railroad gate crossing, and if that fact is relevant, it will be admissible. Complications arise when what is heard and recorded is the speech of another. In that instance, one must determine whether the

words spoken, because they may constitute second level hearsay, ought to be redacted from a report otherwise admissible. Logically, the first inquiry ought to be whether the words are hearsay at all. If they are not, their admission would not offend the hearsay rule. If they are, a further analysis must be undertaken to determine whether there exist separate circumstantial guarantees of trustworthiness sufficient to permit their admission as an exception to the hearsay rule.

Hearsay is generally defined as a statement[6], other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Thus, when a statement is offered for some purpose other than to prove the truth of the matter asserted therein, it is not hearsay. Words heard by a police officer in the course of an investigation and properly recorded in a police report may, for example, be admissible because they prove a libel, or because they prove that the declarant was alive at a particular time. In such cases, the evidence is offered simply to prove that the words were spoken, and not to prove the truth of the matter asserted by the declarant. For that limited purpose, the evidence is admissible without requiring the presence of either the declarant or the police officer.

If, on the other hand, the statement is offered for the truth of the matter asserted therein, it is hearsay, and its presence in a business record will not shield it from the operation of the hearsay rule. The presence of the statement in the police report provides the circumstantial guarantees of trustworthiness which permit the conclusion that the words were spoken, without requiring the presence of the officer who heard them—it tells nothing about the truth of the matter asserted by the declarant. If, however, there are separate circumstances providing the requisite indicia of

---

**6.** A "statement" within the meaning of the hearsay rule may consist of an oral or written assertion, or nonverbal conduct intended as an assertion.

trustworthiness concerning the truthfulness of the statement, the statement may be admissible as an exception to the hearsay rule. In that case, the statement is admissible because it falls within an exception to the hearsay rule. The fact that the statement was made is proved by the report. Examples would include dying declarations or admissions against interest heard by the officer and included in his report.

 Applying this analysis to the statements contained in Officer Ash's report, we conclude that the statements were admissible if offered solely for impeachment, i.e., to show that on a prior occasion the witness had uttered statements inconsistent with her present testimony. They were not, however, admissible if offered to prove the truth of the matter asserted in the statements. If offered for impeachment, the statements were not hearsay. They were being offered solely to show that they had been uttered. If offered for the truth of the matter contained therein, they were hearsay, and because no exception to the hearsay rule appears to be applicable, they would have been inadmissible.

The procedural question presented is whether a general objection made to a general offer of a document admissible only for a limited purpose is sufficient to preserve for appellate review a ruling sustaining that objection. Ali argues that because the report was admissible, albeit for a limited purpose, it was error to exclude it. The burden, he says, was upon the State to request a limiting instruction if it so desired. The State argues that because the report was not generally admissible the objection was properly sustained, and the burden was on the proponent to limit his offer of the evidence to the purpose for which it was admissible.

The effect of a general objection in this State is far-reaching. Maryland Rule 2–517 provides that "[t]he grounds for objection need not be stated unless the court, at the request of a party or on its own initiative, so directs." We have

said that when the trial court does not request a statement of the grounds for an objection, a general objection is sufficient to preserve all grounds which may exist. *von Lusch v. State,* 279 Md. 255, 262–63, 368 A.2d 468 (1977); *Bailey v. State,* 263 Md. 424, 427–28, 283 A.2d 360 (1971). The question presented by this case involves the application of that principle to a document that is neither wholly admissible nor wholly inadmissible, but is admissible for a limited purpose.

As early as 1843 our predecessors held that the party seeking to introduce hearsay evidence for the purpose of impeachment had the burden of apprising the court of the limited basis upon which the offer was made. *Wolfe v. Hauver,* 1 Gill 84, 92 (1843). More recently, Professor McLain has noted that the rule remains unchanged.

> When evidence is excluded which on its face is inadmissible but which could properly be admitted under some theory, there is no error unless the proponent of the evidence has explained to the trial judge how the evidence is admissible. Similarly, when evidence is admissible only for a limited purpose or only against one party and not another, sustaining an objection to it will be proper unless its proponent explains that it is being offered for only the limited permissible purpose. (footnote omitted).

*McLain, Maryland Evidence,* § 103.20 at 47.

On the other hand, in *Mulcahy v. State,* 221 Md. 413, 425–26, 158 A.2d 80 (1960), we held that a general objection to evidence admissible as to one charge but not as to another was insufficient to preserve the error for appellate review.

> Ordinarily, an error in the general admission of evidence which is proper only for a particular purpose cannot be urged on appeal unless its admission for another purpose was properly excepted to in the trial court either by way of an objection, a motion or other appropriate action to have it so limited.

*Id.* at 426, 158 A.2d 80.

We need not here resolve the question of the nature and extent of the burden resting upon each of the parties with respect to the limited admissibility of the hearsay evidence,[7] because we shall hold that the exclusion of the evidence in its entirety was well within the discretion of the trial judge on the ground that it was merely cumulative. The prior inconsistent statements of Waligora were being placed before the jury to impeach Waligora's credibility. This objective was fully accomplished through the testimony of Officer Ash, who recounted Waligora's statements in every detail requested by Ali's attorney. Introduction of the report merely repeated testimony just given. The report was properly excluded as unnecessary and cumulative. *Drug Fair v. Smith,* 263 Md. 341, 354–55, 283 A.2d 392 (1971); *Nash v. State,* 69 Md.App. 681, 689–90, 519 A.2d 769 (1987). The State's general objection preserved this ground. *von Lusch v. State,* 279 Md. at 262–63, 368 A.2d 468.

### III.

The second evidentiary ruling challenged by Ali relates to the refusal of the trial judge to exclude certain testimony by Dr. Roger Schneider, who treated Waligora when she was brought to the Baltimore City Hospital Shock Trauma Unit immediately after the shooting. The evidence in question dealt with the known side effects of medication given to Waligora during her stay at the hospital, and was

---

7. We will comment in passing that if we assume the burden was upon Ali, as the proponent of the evidence, to apprise the court of the limited purposes for which it was offered, a strong argument could be made that under the particular circumstances of this case all parties and the trial judge must have known that the report was being offered solely for impeachment. The statements of Waligora contained in the police report were consistent in placing Ali at the scene of the shooting, and it is clear Ali was not suggesting that those statements were true.

offered by the State as a possible explanation for the inconsistencies in her statements. Waligora testified that she was "very disoriented" when she first spoke to a police officer, and that she vaguely remembered talking to Officer Ash during the first three days of her hospitalization because she was "kind of in and out of it." She testified that she was heavily medicated during those first three days, vaguely remembered talking to Officer Ash, and believed she had said some "bizarre things" as a result of the medication.

After qualifying Dr. Schneider as an expert in the general field of medicine, the prosecutor had the doctor read into the record the dates and times that demerol and vistaril had been administered to Waligora, and the dosage given on each occasion. He then asked the witness:

Doctor, through your training and experience in prescribing drugs to patients, do you have an opinion based on that training and experience as to what, if any, effect 50 to 75 milligrams given in the doses during the times that were given would have on a woman of Mrs. [Waligora's] height, age, weight, and medical condition?

Defense counsel objected, arguing that because the witness did not examine Waligora at any time subsequent to his treatment of her in the shock trauma unit, he should not be permitted to express an opinion concerning her condition at any later time. Additionally, defense counsel contended that any testimony of Dr. Schneider concerning the known effects of demerol and vistaril would amount to no more than speculation, or the expression of a possibility, with respect to the actual impact the drugs may have had upon Waligora, because people respond differently to medication.

The trial judge ruled that the doctor would not be permitted to speculate as to the effect of the drugs on Waligora, nor would he be permitted to say whether she was coherent or incoherent during the times that the doctor had no opportunity to observe her. Instead the judge ruled, "[h]e's

not going to be permitted to speculate, and if there is a problem about how he testifies maybe I can strike his testimony.... He's only going to be permitted to say the probable effect of the drugs that the record shows she was administered at the particular time." With those guidelines established, the witness was permitted to answer the question, and stated that the drugs should have alleviated the pain and should have "sedated her some." This colloquy ensued:

> Prosecutor: Do you have an opinion within a reasonable degree of medical certainty as to what, if any, side effects the two drugs being given together in those dosages at those times would have on Mrs. [Waligora]?
>
> Dr. Schneider: Yes, I do.
>
> Prosecutor: Could you give us that please, Doctor?
>
> Dr. Schneider: There are multiple potential side effects to these drugs. One is nausea and vomiting. The second is respiratory depression. Third is increased sleepiness or drowsiness. And fourth is a lack of complete ability to respond coherently to questions.
>
> Defense Counsel: Objection.
>
> The Court: Overruled.

We conclude that the prosecutor had a right to present evidence from this expert concerning the known side effects of specific drugs given in the doses and at the time shown by the record to a person of the height, age, weight, and known medical condition of Waligora. The prosecutor's last question strayed from the track established by the court. The doctor's answer did not. The objection to the answer was properly overruled.

The State was not attempting to establish by the doctor's testimony alone that Waligora was disoriented when she spoke to Officer Ash during the first three days of her hospitalization. Waligora had already testified to that fact. At that point, the jury had at least two obvious options concerning the inconsistencies in Waligora's statements: 1)

she was lying, or 2) her ability to accurately recount the details of the event was adversely affected by the medication she had been given. The State was offering the testimony of an expert to show that these drugs *could,* and were known to, cause this effect upon a person such as Waligora. This information was relevant, and potentially useful to the jury. A juror attempting to determine whether Waligora was telling the truth when she said she was disoriented or "in and out of it" because of medication would obviously benefit from knowing as a scientific fact whether that medication could, or often did, produce such an effect. Proof that the medication was known to diminish the ability to respond coherently to questions was therefore relevant and admissible.

The prosecutor's final question went off track because he asked what side effects the drugs would have had on Waligora, rather than asking what side effects were known with reasonable probability to occur to a person such as Waligora. The doctor did not respond directly to the question, but answered only by stating that there are multiple side effects to the drugs, and naming four such side effects. The doctor's answer was entirely proper, and within the correct guidelines established by the trial judge. Notwithstanding the wording of the prosecutor's question, the answer did not suggest that the doctor was giving an opinion that Waligora had in fact suffered any of the known side effects. Any possible question concerning the precise meaning of the doctor's testimony on this point was removed on cross-examination when Dr. Schneider testified that he had only named four of at least 24 known side effects, and that he could not say which, if any, of these possible side effects Waligora actually suffered. The trial judge did not err in any of his rulings on this evidentiary question.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.