28 A.3d 675

**Anthony Jerome MILLER**

v.

**STATE of Maryland.**

**No. 77, Sept. Term, 2009.**

Court of Appeals of Maryland.

Sept. 20, 2011.

Michael R. Malloy, Assistant Public Defender (Elizabeth L. Julian, Acting Public Defender, Baltimore, MD), on brief, for Petitioner/Cross–Respondent.

Cathleen C. Brockmeyer, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Respondent/Cross–Petitioner.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

MURPHY, J.

In the Circuit Court for Baltimore City, a jury convicted Anthony Jerome Miller, Petitioner, of two counts of second degree murder. The State's evidence was sufficient to establish that he had committed those offenses on April 11, 2003. After Petitioner's convictions were affirmed by the Court of

Special Appeals in an unreported opinion, he filed a petition for writ a of certiorari in which he presented this Court with the following question:

Did the lower courts err by ruling admissible a handwriting expert's testimony that petitioner might have written the victim's signature on an important questioned document and that, based on his comparison of documents while on the stand testifying, the "general appearance" of the handwriting on the questioned document did not match the victim's handwriting?

We granted the Petition. 409 Md. 413, 975 A.2d 875 (2009). For the reasons that follow, we hold that neither the Circuit Court nor the Court of Special Appeals erred in their conclusions that the handwriting expert's testimony was admissible. We shall therefore affirm the judgment of the Court of Special Appeals.

## Background

Petitioner was convicted of murdering Jason Convertino and a second victim (who, in the words of the Court of Special Appeals, "apparently happened to have been visiting Convertino and was in the wrong place at the wrong time"), whose bodies were found in Mr. Convertino's apartment on April 16, 2003. To prove that Petitioner shot them to death five days earlier, the State presented evidence that (1) Petitioner's DNA "matched" the DNA on latex gloves found in close proximity to Mr. Convertino's body; (2) on April 17, 2003, Petitioner pawned Mr. Convertino's laptop computer, (3) on April 9, 2003, Petitioner requested that the travel agency making arrangements for his honeymoon trip to Cancun fax to him an "authorization to charge" form so that the $2,015.98 he owed the agency could be charged to the credit card of an unnamed friend, (4) during the late evening of April 11, 2003 and during the early hours of April 12, 2003, Petitioner placed more than twenty phone calls to one Earl Fowlkes, claiming to be "in trouble," and requesting that Fowlkes pick him up on the east side of Baltimore; and (5) on April 12, 2003, the travel agency received a fax transmission of the authorization form, purport-

edly signed by Mr. Convertino on April 10, 2003, that allowed the agency to obtain the funds owed by Petitioner from Mr. Convertino's account. It is the testimony related to the "authorization to charge" that is at issue in the case at bar.

The State's closing argument includes the following discussion of the evidence linking Petitioner to the murders:

> ... [The Petitioner] kills [Jason Convertino], takes his grandmother's phone, takes his laptop, takes his credit card, and after the man is dead just buys gas with it.
>
> *   *   *
>
> And how do we know that Jason [Convertino] didn't, out of the courtesy of his heart, give a man who did not invite him to his wedding, a $2,000 honeymoon? How do we know that? Well we heard Robert [Verderamo], the State's expert, testify that this handwriting, he couldn't say for sure but it had a lot in common with the defendant's handwriting. So then I asked him to look at Jason's Chevy Chase Bank account records full of Jason's signature. Remember [exhibits] 44A through 44K I think it was? You have lots and lots of checks from Jason and the signature on these checks looks absolutely nothing like the signature on the travel voucher. So what does he do? He is slick he dates it April 10th because Jason is still alive on April 10th. But he can't get it back to his good friend Terry Robinson on the 11th because he can't get out of Dodge. He is stuck in Fells Point. He calls Earl [Fowlkes] on April 11th, after he's killed the two men and taken everything [he can] find of Jason's .... he's called Earl [Fowlkes] over and over and over and over saying man get me out of here. Come get me, I'm in trouble..... only he can't get out of Dodge. Earl's not coming and so all night he calls, over and over and over and over[.]

In support of its contention that Petitioner forged the deceased Mr. Convertino's signature on the authorization to charge form, the State presented the testimony and written report of Robert J. Verderamo, a Baltimore City Police De-

partment questioned document expert. The following tran-
spired prior to Mr. Verderamo's testimony:

[DEFENSE COUNSEL]: I'm going to object to this next
witness ...

[PROSECUTOR]: If I understand—normally, when I have
these handwriting cases, the expert who is—there's no
question he's an expert—says in my expert opinion this guy
wrote this. This handwriting is his handwriting.

THE COURT: Right

[DEFENSE COUNSEL]: If I understand it, [the prosecu-
tor] will certainly correct me if I am wrong, he's not going
to say that. He's going to say it could have been him; it
might have been him; maybe it's him; we can't say it's not
him.

It seems to me that that is not admissible. That is prejudi-
cial and it's not admissible evidence. The probative value
has—it's just not admissible. I think he's going to have to
say more—and I don't think he can—than it could have
been him; we can't exclude him as the writer. That's the
basis for my objection, sir.

* * *

THE COURT: [Defense Counsel], you'll have the opportu-
nity to cross examine this witness and to question him in
any respect you wish about the extent of his opinion and
how far it goes, which would be true of any expert.

[DEFENSE COUNSEL]: But you wouldn't even let ... an
expert in another field testify unless he could say within a
reasonable degree of certainty, scientific or medical certain-
ty depending on the context, this was this. You wouldn't, I
don't think, allow an expert to testify that it could have
been, it might have been, I can't say it's not him.

THE COURT: Well that is to the ultimate issue, I think.
In respect to a handwriting expert, I'm presuming that he
can get on the stand and explain how he goes about making
his analysis and why he can reach the conclusion and I can't
exclude that this was his handwriting. That's probative, as
far as that may go. It may not go very far, or it may,

depending on—I don't know how the testimony is going to come out.

I think that, on balance (inaudible) the jury, so I'm going to permit the State to put [Mr. Verderamo] on.

The record shows that the following transpired during Mr. Verderamo's direct examination:

[DEFENSE COUNSEL]: We stipulate to—if you would like to accept it—to Mr. Verderamo's expertise.

[PROSECUTOR]: Okay, Your Honor, I'll offer Mr. Verderamo as an expert in the field of handwriting analysis and identification.

THE COURT: Very well. Base on the Stipulation of Counsel, I will find, and do find, that Mr. Verderamo is qualified as an expert to testify on the issue of handwriting analysis and identification.

\*　　\*　　\*

Q: Now, with regard to the case involving the murder investigation into the death of Jason Convertino and [the second victim] . . . Were you involved in any manner in this investigation.

A: Yes, I was.

Q: What was your role?

A: I had a request to do a comparison between a copy of a travel authorization sheet, or a credit card authorization sheet. That was the question[ed] document that I mentioned. I also had submitted to me index cards with the knowing writing of the suspect. I looked at both sets of documents and did my comparison.

\*　　\*　　\*

Q: I'm going to show you what have been marked for identification purposes only, as State's Exhibit 40, 41, 42 . . . Can you tell us what, if anything, you did with regard to this document? Just briefly.

A: This would be the questioned document. It's labeled as Q, meaning questioned, Q–1 on my report. This is the

document I used for compar—this is the actual document that I used for comparing to the index cards.

Q: Is that the document that says, "Travel Concepts" with Jason Convertino's name and credit card information on it?

A: That's correct. I have that listed as "One Travel Concepts Authorization to Charge Form."

Q: Okay and that's already in evidence. Let's show you what's been marked, for identification purposes only, as State's exhibit 40. What are we looking at here?

A: This is the actual report, outlining exactly the results of my examination.

Q: What is State's 41 for identification purposes?

A: There are 113 index cards that were indicated to me as the known handwriting of [Petitioner]. They have different writings on them, each one of the index cards.

I looked at these as the known writing and used that to make a comparison with the travel authorization sheet.

⁂ * ⁂

Q: Now, will you please tell us what you did?

A: Well, first thing I did was, I first looked at the questioned document. In doing a handwriting comparison, handwriting is a mental and muscular coordinated process. It's a habit and it's identifiable because it's a habit, and you repeat the characteristics.

I'm looking for these repetitive characteristics that are identified to a particular individuals writing.

The type of characteristics I'm looking for are, like, the size of the writing; the spacing between the letters; the pen movements; underhand connecting strokes; overhand connecting strokes; proportion of the letters, how tall the "T" is to an "A" or maybe how high up on the cross bar the "T" is compared to the staff of the "T"; or how big one letter is compared to another letter. I'm also looking for subtle pen movements.

So, I first looked at the questioned document to see what I thought was important for identification purposes. After I

looked and saw what I thought was important on the questioned document, I then went to the index cards and I wanted to see what characteristics were presenting in the index cards and what kind of results I could have, having looked at both the questioned document and compared it to the known document and that is how I come to a conclusion.

\* \* \*

[Mr. Verderamo]: The conclusion here is—I can read my report and I'll explain to you my results after showing you this.

Having compared the questioned travel document with these index cards, my report reads:

**Due to unexplained variations in the writing, in the questioned writing of Q–1, there was not a basis for identifying Miller as the writer of this document. However, there are characteristics of Miller [that] appear in the document which prevents his elimination as a suspect in this case.**

Q: What does that mean?

A: As I mentioned, I saw several characteristics that I thought were in common. I pointed this out. "Unexplained variations", "due to unexplained variations in the questioned writing", the backwards slant, I couldn't explain that.

I didn't know if this was a deliberate attempt, either in this writing or in this writing, to change the natural writing habit because these were appearing in combination. I had characteristics in common. I had characteristics unexplained. I didn't come to a definitive conclusion but there were characteristics here, that I could not ignore, in common between the two. (Inaudible).

Q: Now, when you say that you cannot eliminate him as a suspect, what does that mean?

A: Well, the fact is, these characteristics are common in both. The possibility exists that this is the same writer. However, when I used subjective evaluation, I would like to have something overwhelming. I guess may[be] I'm over

conservative but I'm not making a positive identification unless I had similar characteristics.

Q:   Are you saying its not him?

A:   No, I can't say that.

Q:   So can you give it to us in lay terms exactly what you are saying?

A:   What I'm saying is, there's characteristics here that I don't understand why they are here.  There are characteristics that are there that are common between the two.  That sort of gives me pause to make a positive identification (inaudible) basis to make (inaudible) identification.  I cannot ignore what I saw and what I demonstrated to you today.

**Q:   S[o], you can't say its him and you can't say for sure it isn't him?**

**A:   That's correct.**

**Q:   And that's a reasonable degree of scientific certainty?**

**A:   That's correct.**

(Emphasis supplied).

The following transpired during Mr. Verderamo's cross-examination:

Q:   Frequently you are able to sit on the stand and look at the jury and say, the same guy, the same person wrote this, correct?

A:   That's correct.

Q:   And you can't do that in this case?

A:   Not in this case, no.

\*          \*          \*

Q:   By the way, did you—you took the time to compare [Petitioner's] handwriting to the known signature in State's exhibit 37 correct?

A:   Yes.

\*          \*          \*

Q:   Did you attempt to compare a number of known signature [sic] of Mr. Convertino with the exhibit 3[2]?

A: The only exemplars that I compared were the 113 index cards. I did not have any other exemplars.

Q: You were just trying to see if [Petitioner] wrote that?

A: Correct

Q: You were never asked to determine whether that, in fact, is Jason Convertino's?

A: That's right.

The following transpired at a bench conference that preceded Mr. Verderamo's redirect examination:

[Prosecutor]: Your Honor, I'm going to offer into evidence at this time [State's exhibit 43]. . . .

[Defense Counsel]: . . . I am certainly entitled to know of any expert reports. Now, I knew about, I knew about [Petitioner's]—the report Mr. Verderamo prepared with respect to [Petitioner]. I certainly don't object to that but I'm not aware of any report or any thing with respect to any examination which could have been done, obviously, prior to the middle of trial, with respect to Mr. Convertino.

Now it's true that I asked that question but it isn't really a very tricky or clever question. It pretty much jumps out at you. Certainly, the State if they wanted to have Mr. Convertino's signatures examined by this expert, prior to trial and offer an opinion, which Discovery would have been with [the] Defense, the State had all the time in the world to do that.

Now I feel I am basically being sandbagged.

\*   \*   \*

THE COURT: There has been no question from the very beginning that the State was taking the position that [Jason Convertino's] signature on Exhibit No. 32 was not his signature, correct?

[Prosecutor]: Correct

THE COURT: There has been no issue about that from the beginning of the case.

\*   \*   \*

[Defense Counsel]: Yes sir, I agree.

THE COURT: Now, even in the absence of an expert handwriting analyst, would it not be in the jury's responsibility as the finder of fact, to be able to make a comparison of a known signature by Jason Convertino and the signature on Exhibit 32? They don't need expert testimony to make a handwriting comparison, true?

[Defense Counsel]: I agree with you

THE COURT: Ok

[Defense Counsel]:—but here's the distinction . . . Yes, I am saying I didn't. What I'm saying I didn't receive is any indication or report indicating that this expert would testify that these were not Convertino's signatures.

THE COURT: I understand that.

\* \* \*

THE COURT: . . . The further objection that [Defense Counsel] is raising is whether or not [Mr. Verderamo], an expert can offer an opinion in redirect, as to whether or not the signature which appears on State's 43 is written by the same individual who signed the document as State's No. 32 is that correct?

[Defense Counsel]: Yes your Honor.

THE COURT: Okay, and [if I understand the Prosecutor's argument, it is that Defense Counsel] opened the door to this line of questioning by his question on cross about whether or not Mr. Verderamo had ever compared a known signature by Mr. Convertino with a signature on State's Exhibit 32?

[Prosecutor]: That's correct.

\* \* \*

[Defense Counsel]:—I may have opened the door, I mean, I haven't. I asked him that question, I'm not saying that the State can't, for example, bring in a lay witness to say I recognize that signature. What it doesn't allow, I respectfully suggest, to allow an expert to now, while he's on the

witness stand, when I've never been given any reports or any indication that he's made that kind of examination

\* \* \*

THE COURT:.... I think, quite frankly that you did open the door to have this question asked on redirect, so I'm going to overrule the objection.

On redirect, Mr. Verderamo testified as follows:

Q: Now, I'm going to show you (inaudible), State's 44J, which is the signature card from the Chevy Chase Bank records ... Can you compare it to the Jason Convertino signature on the travel voucher for us?

A: Well, I'm not in a position to do a full handwriting comparison here. Again, we're dealing with copies but just general, overall appearance—

[Defense Counsel]: I again preserve my objection.

THE COURT: Very well.

[Prosecutor]: Go ahead.

[Mr. Verderamo]: The signature on the Chevy Chase, 44J document a little bit tighter, including a middle initial, which the travel document does not have.

I see a difference in the crossing of the "T". It looks like the finishing of the "O" comes back to complete a "T" crossing, so there's—it's just—I mean, I'm not doing a full comparison here but I do see a general appearance difference between here and the Chevy Chase documents.

[Prosecutor]: To a reasonable degree of scientific certainty?

[Mr. Verderamo]: For being on the witness stand and not being in my laboratory, yes.

As stated previously, the jury convicted Petitioner of two counts of second degree murder in the shooting deaths of Mr. Convertino and the second victim.

### Discussion

### I.

The history of Md. Rule 5–901(b)(3) makes it clear that (1) the jurors themselves were entitled to compare the

signature on the "One Travel Concepts Authorization To Charge Form" with the specimens that had been provided by Petitioner, and (2) the State had the right to present expert testimony on that issue.[1] When this Court adopted the Maryland Rules of Evidence in 1993, we included MRE 5–901, § (a) of which is identical to FRE 901(a), and § 5–901(b)(3), which is substantially similar—but not identical—to FRE 901(b)(3).[2] MRE § 5–901(b)(3) provides that the requirement of authentication may be satisfied by "[c]omparison by the court or an expert witness with specimens that have been authenticated." The REPORTER'S NOTE to the version of § (b)(3) that we adopted includes the following explanation for the Rules Committee's proposal:

> Subsection (b)(3) is derived from F.R. Ev. 901(b)(3), under which an item may be authenticated by comparing it, for purposes of admissibility, with another item which has previously been authenticated to determine if the items came from the same source. The Committee has modified the language of F.R. Ev. 901(b)(3) so as not to change Maryland law to the effect that questions of admissibility, including those involving authentication, are to be determined by the judge. **This is not intended to detract from the jury's ultimate responsibility for determining comparability of specimens that have been admitted.**

---

**1.** Several opinions of this Court include discussion of "inconclusive" handwriting analysis. *See e.g., Schultz v. Bank of America,* 413 Md. 15, 21 990 A.2d 1078, 1082 (2010) (handwriting expert testified that checks drawn on plaintiff's account "appeared to have been forged" with plaintiff's signature); *Williams v. State,* 342 Md. 724, 733, 679 A.2d 1106, 1111 (1996) (handwriting expert testified that "there were similarities" between petitioner's handwriting and a sign left at the scene, but could not form a definite opinion); *Foster v. State,* 304 Md. 439, 445, 499 A.2d 1236, 1239 (1985). In none of those cases, however, were we presented with the argument that an "inconclusive" opinion is unfairly prejudicial.

**2.** Since the Federal Rules of Evidence have been "on the books," FRE 901(b)(3) has provided that the requirement of authentication may be satisfied by "[c]omparison by the trier of fact or by expert witnesses with specimens which have been authenticated."

(Emphasis supplied). The "abuse of discretion" standard of review is applicable to the Circuit Court's ruling that the State was entitled to present Mr. Verderamo's opinion that "there are characteristics of [Petitioner's writing] . . . in the ['authorization to charge form'] which prevents his elimination as a suspect in this case."

Petitioner argues that he was unfairly prejudiced by the opinion that he could not be "eliminated as a suspect" because Mr. Verderamo was unable to express the opinion that Petitioner *had* forged Mr. Convertino's signature on that document.[3] This argument is identical to the argument presented to the United States Court of Appeals for the Ninth Circuit in *United States v. Fleishman*, 684 F.2d 1329 (9th Cir.1982), in which that court affirmed the convictions of three defendants who had been found guilty of conspiring to distribute cocaine.

---

**3.** Petitioner does not argue that expert handwriting analysis is inadmissible under the Maryland Rules of Evidence. In *United States v. Jones*, 107 F.3d 1147 (6th Cir.1997), an appellant convicted of credit card fraud argued that she was entitled to a new trial on the ground that the trial court should have sustained her objection to the testimony of a forensic document analyst who opined that the appellant had signed three incriminating documents. According to the appellant, as a result of the standards established by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), opinions by handwriting experts are no longer admissible. While concluding that the analyst's opinion was admissible under FRE 702, the United States Court of Appeals for the Sixth Circuit stated: ·

> [A]ppellant admits [in her brief] that 'handwriting analysis was never scrutinized under *Daubert's* predecessor, *Frye v. United States*,' [and] is, therefore, arguing that even though expert handwriting analysis was never considered a matter of scientific knowledge by any of the courts applying the *Frye* test over a seventy-year period, we should treat it as such now and conclude that it fails the *Daubert* reliability requirements. We decline her invitation to do so.
>
> \*　　\*　　\*
>
> [I]f we were to hold that handwriting analysis is not a field of expertise under the Federal Rules of Evidence, there would be no place for expert witnesses to compare writing on one document with that on another in order to authenticate a document. In other words, appellants suggested approach would render Rule 901(b)(3) meaningless. We refuse to adopt that interpretive approach.

107 F.3d at 1157–59. (Footnotes and internal citations omitted).

The government's evidence included "a piece of paper with a series of numerals inscribed on it [that] were later linked to the cocaine negotiations over price and quantity." *Id.* at 1334. One of the defendant/appellants, Peter Combs, argued that he was unfairly prejudiced by "inconclusive" opinion testimony that he was the person who had written the numerals. While rejecting Combs' argument that "prejudice resulting from the limited level of certainty of [the handwriting expert's] testimony outweighed its probative value," the *Fleishman* Court stated:

*The Handwriting Expert's Testimony*

After testifying to his qualifications as an expert in handwriting analysis, Bruce Greenwood of the Los Angeles Police Department testified that there were "definite indications" that Combs wrote the note found in Ramada Inn Room 1021. On cross-examination, Greenwood admitted that his opinion was qualified by the limited number of writings available for comparison and he could not provide a definite conclusion whether Combs indeed wrote the note. Greenwood also testified that he could not find any convincing evidence that Green had authored the note [ ], nor could he conclude that the writing was made by anyone other than Peter Combs.

\*     \*     \*

The requisites of Fed.R.Evid. 702 were met. Greenwood was properly qualified as a handwriting expert, and his testimony, regardless of the level of certainty as to his conclusions, was helpful in assisting the jury in its deliberation of the relevance, if any, of the note found in Room 1021. Greenwood provided the jurors with an extensive review of the principles of handwriting analysis he used while making the comparisons he made. The jury could, therefore, properly apply the principles to the facts of the case in order to reach their own conclusion regarding the suggested authorship of the note.

The cases cited by Combs regarding the inadmissibility of certain types of expert testimony are inapposite here.

Those cases are concerned with the possible prejudice to the defendant's right to a fair trial of admitting testimony of purported experts based upon insufficiently substantiated scientific theories, techniques or tests. It is undisputed that handwriting analysis is a science in which expert testimony assists a jury. *See generally,* 32 C.J.S. *Evidence* §§ 612–622 (1964). *See also United States v. Spencer,* 439 F.2d 1047, 1049 (2d Cir.1971) (handwriting expert's testimony that the alleged forged securities were "probably prepared" by the defendant held admissible). All that is really disputed here is that Greenwood's opinion was inconclusive. To the extent that Greenwood's testimony lacked certainty, that uncertainty was probed extensively during cross-examination. Absolute certainty of result is not required for admissibility. *United States v. Baller,* 519 F.2d 463, 466 (4th Cir.), *cert. denied,* 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975). Combs' issue with the certainty of Greenwood's testimony, therefore, goes to the weight given the testimony; the district court did not abuse its discretion in admitting it.

*Id.* at 1336–37. (Internal citations and footnotes omitted).

Other cases that are consistent with *Fleishman* include *United States v. Jolivet,* 224 F.3d 902 (8th Cir.2000), in which the United States Court of Appeals for the Eighth Circuit affirmed Catherine Jolivet's mail fraud convictions based in part on the testimony of a handwriting expert, who opined that Jolivet was the "likely" signatory on documents that had been submitted to insurance companies. While rejecting the argument that this "likely, but not certain" opinion should have been excluded, the *Jolivet* Court stated:

Jolivet complains that the district court erred in admitting the testimony of Donald Lock. Lock, proffered as an expert in handwriting comparison, analyzed a large number of documents at trial to determine if Jolivet was the signatory on the documents. After comparing the questioned documents with other documents that were known to contain Jolivet's signature, he opined that the signatory on the

questioned documents was likely Jolivet, but he would not state that he was absolutely certain of his conclusions.

In order to be admissible, expert testimony must be both relevant and reliable. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The district court is afforded wide latitude in making its reliability and relevance determinations. *See id.* at 152, 119 S.Ct. 1167.

\* \* \*

Because Lock was particularly well-qualified in analyzing questioned documents—having studied and taught internationally, written manuals, and practiced in the field for over two decades, performing several thousand comparisons—the district court did not abuse its discretion in finding Lock's expert testimony to be reliable. *See United States v. Paul,* 175 F.3d 906, 910–11 (11th Cir.1999). Similarly, in light of Lock's experience and expertise, we believe his testimony may be properly characterized as offering the jury knowledge beyond their own and enhancing their understanding of the evidence before them. *See id.* at 911. The district court thus committed no abuse of discretion ... in admitting Lock's testimony.

*Id.* at 905–06.

In *United States v. Herrera,* 832 F.2d 833 (4th Cir.1987), while affirming conspiracy to import marijuana convictions, the United States Court of Appeals for the Fourth Circuit was presented with an argument that the trial court "improperly allowed a handwriting expert to offer an unduly speculative opinion based upon 'a high degree of belief.'" *Id.* at 835. While holding that the trial court was "not compelled to strike [the handwriting expert's testimony] as 'speculative,'" the *Herrera* Court stated:

An expert opinion regarding handwriting need not be based upon absolute certainty in order to be admissible. It was well within the bounds of sound discretion for the court to

allow the jury to weigh the probative value of the somewhat equivocal opinion.

*Id.* at 837. (Internal citations omitted).

*Herrera* was cited with approval in *United States v. McGlory,* 968 F.2d 309 (3d Cir.1992), and in *Sewell v. State,* 721 So.2d 129, (Miss.1998). In *McGlory,* the United States Court of Appeals for the Third Circuit stated:

Under Federal Rule of Evidence 702, the expert testimony need only be helpful to the jury. Expert testimony as to the similarities in handwriting is generally admissible. *See United States v. Cairns,* 434 F.2d 643, 644 n. 3 (9th Cir. 1970). This is so even if the handwriting expert is not absolutely certain that the handwriting is that of the defendant. *See United States v. Herrera,* 832 F.2d 833, 837 (4th Cir.1987); *United States v. Fleishman,* 684 F.2d 1329, 1336– 37 (9th Cir.), cert. denied, 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982). Any issue regarding the certainty of Riordan's testimony goes to the weight given that testimony and could be tested by cross-examination. The district court did not abuse its discretion in admitting the testimony.

*Id.* at 346. (Footnotes omitted). In *Sewell,* the Supreme Court of Mississippi stated:

Even when the expert's opinion does not serve to identify or eliminate a particular writer as the source of questioned writing, that opinion is helpful to the trier of fact because "an expert opinion regarding handwriting need not be based upon absolute certainty in order to be admissible." *United States v. Herrera,* 832 F.2d 833, 837 (4th Cir.1987).

*Id.* at 139.

We agree with the above quoted authorities, which are entirely consistent with medical "causation" opinions approved of by this Court and by the Court of Special Appeals.

In *Langenfelder v. Thompson,* 179 Md. 502, 20 A.2d 491 (1941), while adopting "the prevailing view that the opinions of medical experts are admissible as to the cause which produced, or probably produced, or might have produced, a certain physical condition," this Court stated:

The opinion of an expert as to the probability, or even the possibility, of the cause of a certain condition may frequently be of aid to the jury; for when the facts tend to show that an accident was the cause of the condition, the assurance of an expert that the causal connection is scientifically possible may be helpful in determining what are reasonable inferences to be drawn from the facts.

*Id.* at 507, 20 A.2d at 493.

In *Hughes v. Carter*, 236 Md. 484, 204 A.2d 566 (1964), while holding that a plaintiff's evidence was sufficient to generate a jury issue on the question of whether she had suffered pneumonia as a result of an automobile accident, even though her attending physician expressed a "not very positive" opinion that it was "possible" that the accident caused the plaintiff's pneumonia, this Court stated:

The appellant cites *Ager v. Baltimore*, 213 Md. 414, 421 [132 A.2d 469 (1957) ], for the proposition that the jury may not be permitted to "form a judgment or conclusion on the basis of testimony which admits of mere possibilities." But in *Charlton Bros. v. Garrettson*, 188 Md. 85, 94 [51 A.2d 642 (1947) ], Judge Markell, for the Court, said: "The law requires proof of probable, not merely possible, facts, including causal relations. Reasoning *post hoc, propter hoc* is a recognized logical fallacy, a *non sequitur*. But sequence of events, plus proof of *possible* causal relation, may amount to proof of *probable* causal relation, in the absence of evidence of any other equally probable cause" (citing cases). See also *Wilhelm v. State Traffic [Safety ] Comm.*, 230 Md. 91, 103 [185 A.2d 715 (1962) ] and cases cited, including *Bethlehem–Sparrows Point Shipyard, Inc. v. Scherpenisse*, 187 Md. 375 [50 A.2d 256 (1946) ], and *Baltimore City Pass. Ry. v. Kemp*, 61 Md. 74, 61 Md. 619. We think there was sufficient evidence of a causal connection in the instant case to warrant submission of the question to the jury.

*Id.* at 486, 204 A.2d at 568.

In *Ali v. State*, 314 Md. 295, 550 A.2d 925 (1988), this Court affirmed convictions of murder and related offenses based in

part on expert testimony about the side effects of medication given to a surviving victim during her stay at a hospital, which was "offered by the State as a possible explanation for the inconsistencies in her statements [made to police officers while she was being treated for her injuries]." *Id.* at 307–08, 550 A.2d at 931. While holding that this testimony was properly admitted, this Court stated:

> [T]he jury had at least two obvious options concerning the inconsistencies in [the victim's] statements: 1) she was lying, or 2) her ability to accurately recount the details of the event was adversely affected by the medication she had been given. The State was offering the testimony of an expert to show that these drugs *could,* and were known to, cause this effect upon a person such as [the victim]. This information was relevant, and potentially useful to the jury. A juror attempting to determine whether [the victim] was telling the truth when she said she was disoriented or "in and out of it" because of medication would obviously benefit from knowing as a scientific fact whether that medication could, or often did, produce such an effect. Proof that the medication was known to diminish the ability to respond coherently to questions was therefore relevant and admissible.

314 Md. at 309–310, 550 A.2d at 932. (Emphasis in original).

In *Wantland v. State,* 45 Md.App. 527, 413 A.2d 1376 (1980), while rejecting the contention that a defendant convicted of murder was entitled to a new trial on the ground that the medical examiner should not have been permitted to opine that a particular knife "could have" been used to inflict the fatal injuries, the Court of Special Appeals stated:

> Appellant asseverates that it was error for the trial judge to allow the doctor "to testify that it was a reasonable probability that certain things *could* have happened." (Emphasis in [appellant's brief].) Appellant thinks that the doctor should not have been permitted to testify that sodomy could be the cause of the dilation of the victim's anus nor that the knife exhibited to him could have caused the injuries.

It is well established that in this State a medical expert is not required to express his opinion with an absolute certainty, but only with a reasonable probability. *Andrews v. Andrews,* 242 Md. 143, 152, 218 A.2d 194, 200 (1966).

A medical expert is not limited to expressing his opinion as to what actually did happen; he may opine, based on a reasonable medical certainty, that which could have happened, provided, of course, that there is sufficient evidence of a causal connection. *See Hughes v. Carter,* 236 Md. 484, 486, 204 A.2d 566, 567–68 (1964). It was for the jury to find, based on all the evidence, whether sodomy did occur, and whether a particular knife was used in the slaying.

45 Md.App. at 543, 413 A.2d at 1385.

For the reasons stated above, we hold that the Circuit Court did not abuse its discretion when it overruled Petitioner's objection to Mr. Verderamo's opinion that "there are characteristics of [Petitioner's writing] . . . in the ['authorization to charge form'] which prevents his elimination as a suspect in this case."

## II.

Petitioner also argues that he was unfairly prejudiced by what occurred during Mr. Verderamo's redirect examination, when—over the "discovery" objection interposed by Petitioner's trial counsel—Mr. Verderamo opined that he was able to "see a general appearance difference between" the signature on the authorization to charge form and the signature on a Chevy Chase Bank record that had been signed by Mr. Convertino. It is clear, however, from the above quoted portions of Mr. Verderamo's testimony that the questions he was asked on cross-examination "opened the door" to the opinion that was elicited on redirect examination. The "opening the door" doctrine is applicable to cross-examination that has "expanded the scope" of a witness's testimony. *Trimble v. State,* 300 Md. 387, 402–03, 478 A.2d 1143, 1150 (1984). Under these circumstances, the Circuit Court did not abuse its discretion in admitting that opinion.

▆▆▆▆▆▆

**JUDGMENT AFFIRMED; PETITIONER TO PAY THE COSTS.**

Judge HARRELL joins in the judgment only.