*Siamak Paydar v. State of Maryland*, No. 2673, September Term, 2018. Opinion by Kenney, J.

**EVIDENCE – HEARSAY – PUBLIC RECORDS EXCEPTION – WHEN OFFERED AGAINST AN ACCUSED IN A CRIMINAL ACTION**

Md. Rule 5-803(b)(8), commonly referred to as the "public records exception," permits admission of hearsay statements contained within public records and reports. Under the exception, information in a public agency record of "matters observed pursuant to a duty imposed by law, as to which matters there was a duty to report" would ordinarily be admissible. Md. Rule 5-803(b)(8)(A)(ii). But, under Md. Rule 5-803(b)(8)(C), sometimes referred to as the "law enforcement exception," a "record of matters observed by a law enforcement person is not admissible . . . when offered against an accused in a criminal action."

**EVIDENCE – HEARSAY – PUBLIC RECORDS EXCEPTION – BODY CAMERA RECORDINGS BY A LAW ENFORCEMENT PERSON**

Md. Rule 5-803(b)(8)(D) permits a recording from a body camera worn by a law enforcement person to be "offered against an accused" if the recording: (1) is made contemporaneously; (2) is properly authenticated; (3) is otherwise trustworthy; *and* (4) any hearsay statements within the recording fall within an independent hearsay exception under Md. Rule 5-805.

**EVIDENCE – HEARSAY – PUBLIC RECORDS EXCEPTION – BODY CAMERA RECORDINGS BY A LAW ENFORCEMENT PERSON – HEARSAY WITHIN HEARSAY**

Md. Rule 5-803(b)(8)(D) is not a separate and additional exception to the hearsay rule and should not be read as broadening the types of admissible hearsay. For a body camera recording to be admissible, the party offering the evidence must establish a hearsay exception for the statements contained therein.

**CRIMINAL LAW – HARMLESS AND REVERSIBLE ERROR – BOLSTERING THE CREDIBILITY OF A KEY WITNESS**

Erroneous admission of evidence bolstering a key witness's credibility is not harmless.

Circuit Court for Montgomery County
Case No. 132694

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2673

September Term, 2018
_____

SIAMAK PAYDAR

v.

STATE OF MARYLAND
_____

Arthur,
Leahy,
Kenney, James A., III
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Kenney, J.
_____

Filed:  November 22, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

A jury in the Circuit Court for Montgomery County convicted Siamak Paydar, appellant, of first-degree assault and false imprisonment of his wife, Goli Ariani. He was sentenced to twenty years for false imprisonment and a consecutive twenty years for first-degree assault. On appeal, he raises one question:

Did the trial court err in admitting hearsay contained within a body camera video?

For the reasons discussed below, we answer that question "yes" and reverse the convictions.

## FACTUAL[1] AND PROCEDURAL BACKGROUND

Mr. Paydar and Ms. Ariani married in Iran in 2013. In May of 2015, Ms. Ariani moved from Iran to the United States to live with Mr. Paydar. Their son was born in August of 2016.

Ms. Ariani testified that they began having marital relationship issues after their son's birth. An argument between them escalated on the evening of October 7, 2017. According to Ms. Ariani, the argument began when she told Mr. Paydar "my heart is no longer with you."[2] He became angry and headbutted her, which caused her to fall to the floor and impaired her vision. Afterwards, she went upstairs to her bedroom and cried.

---

[1] The State called Ms. Ariani, Margarita Epley, Paul Epley, Sandra Epley, Detective Theresa Durham, Detective Shamus Galey, Officer Joshua Locke, and Officer Michelle Morgado to testify. Defense counsel focused on inconsistences in their various accounts of that evening. The factual background reflects the testimony of Ms. Ariani, Margarita and Sandra Epley and the audio portion of Officer Morgado's body camera video.

[2] During the trial, Ms. Ariani testified in English and in Farsi, and an interpreter translated the Farsi to English.

Returning to the kitchen later, she took a plate of food to the living room. Mr. Paydar grabbed her plate, told her that she had to eat in the kitchen, and she complied. While in the kitchen, she prepared a bottle for their son. Mr. Paydar took the bottle and told her that he would take their son to his room upstairs. She told Mr. Paydar not to keep him up past 8:00 PM, but when she went upstairs, their son was awake in their bedroom. She said to Mr. Paydar, "I told you several times to put him to sleep by 8:00 [PM]. Why didn't you put him in his bed[?]" and he responded by choking her for a few seconds.

Ms. Ariani then took their son to his room. While she was changing his diaper, Mr. Paydar came into the room and whispered in her ear that he would kill her. When she went to her bathroom, Mr. Paydar followed her and shouted, "you came here to destroy my life."

Ms. Ariani ran down the stairs to escape with Mr. Paydar following her. When she opened the front door and screamed, Mr. Paydar slammed the door shut, and told her to go upstairs. She refused, and he grabbed her hair and banged her head against the wall. He then dragged her to the room next to the kitchen and, with electrical tape, taped her hands, feet, and mouth. He told her "I am going to cut you in[to] pieces. I'm going to take you to a dark place[,] and your parents will have to come cry for you."

Mr. Paydar carried Ms. Ariani to the garage, put her into the "trunk"[3] of his SUV, and then put zip ties around her arms and legs. He closed and locked the SUV, and told her, "I'm going to bring my gun. I'm going to take you to a dark place. This is your last night."

When Mr. Paydar left the garage, Ms. Ariani was able to free one hand from the restraints. Getting into the backseat of the SUV, she located the door lock and exited it. She pushed the automatic garage door opener, rolled under the garage door as it opened, and ran to the house across the street. There, she rang the doorbell and called for help. Margarita Epley let her into the house where she remained until the police arrived.

Mr. Paydar was arrested that evening in his home. After his arrest, police searched the house and the SUV. In the SUV, the police found a zip tie in the trunk, and, in the home, they recovered two guns and a backpack that contained a pair of gloves, a plastic bag, a flashlight, and a red hooded sweatshirt.

Defense counsel challenged Ms. Ariani's claim that October 7 was the first time that she told Mr. Paydar that she did not love him with a cell phone video of Ms. Ariani yelling at Mr. Paydar, in Farsi, "I hate you. You are a piece of shit. I will make your life a living hell." Defense counsel also challenged Ms. Ariani's account of the headbutt and choking with photographs of Ms. Ariani taken that evening. She acknowledged there was no bruising or bleeding depicted in the photographs.

---

[3] Although the rear of an SUV is usually referred to as the "back," we will refer to it as a "trunk," as Ms. Ariani did during her testimony.

3

Margarita Epley, the daughter of Sandra and Paul Epley, testified that she heard an unusual scream and asked her parents if they had heard it. About fifteen to twenty minutes later, she heard the doorbell ring several times and pounding on the door. Opening the door, she saw Ms. Ariani with remnants of tape and zip ties on her wrists and ankles, and bloody gums and teeth. On cross-examination, Margarita admitted that she did not provide the police officers with those observations that evening, and that, prior to trial, she did not inform anyone other than her parents about hearing a scream. Defense counsel also challenged her testimony with photographs showing that Ms. Ariani did not have bleeding gums or zip ties on her ankles.

Sandra Epley testified that Margarita had asked her and her husband if they had heard a "weird scream," and that she heard Ms. Ariani knock and pound on the door about fifteen minutes later. When shown a photograph taken of Ms. Ariani that night, Ms. Epley testified that it did not depict Ms. Ariani as she first appeared because she had tape all over her face upon her arrival. Defense counsel impeached her trial testimony with her prior deposition testimony that she did not recall what occurred on October 7.

Officer Michelle Morgado responded to the Epleys' home on the evening of October 7. Prior to her testimony, the State indicated its intention to introduce her body camera video. When defense counsel objected based on hearsay and confrontation grounds, the State argued that the video recording and the statements therein were admissible as an exception to the hearsay rule under Md. Rule 5-803(b)(8)(D).[4]

---

[4] Md. Rule 5-803(b)(8)(D) provides:

4

Before the video was played, defense counsel renewed his objection:

[DEFENSE COUNSEL]: Your Honor, I am not too sure . . . about this body worn camera [exception] . . . but when you look . . . they talk about . . . camera records of matters observed.

THE COURT: Uh-huh.

[DEFENSE COUNSEL]: So, I think a fair reading of that section would be you can only use the body camera as a record of matters observed. It doesn't mean the body camera would allow, or the fact that the body cam (unintelligible) hearsay statements of witnesses to just come in willy-nilly because they're on a body camera. That's – and again, that would be consistent with medical records, other types of documents. (Unintelligible) body camera comes in, but we're talking about – it can be used to show what was observed by the officer, not what was said by the people on the body camera.

THE COURT: Okay. So, I think that would be one way of interpreting it. I guess the way I would interpret it is that, because the sentence, the section starts off saying subject to rule 5-805, if you go to rule 5-805, that's the rule that doesn't allow hearsay within hearsay. So, if the exception is that you can't allow hearsay within hearsay, then the general would be that – I mean, they're clearly talking about statements.

[DEFENSE COUNSEL]: Right.

THE COURT: So, if they're not allowing statements within statements, then clearly this is, to me, talking about statements. So, I would interpret this to mean that only recorded statements that are not violative of 5-805, which are statements within statements, are admissible as long as they're authenticated, they're made contemporaneously, and [their] circumstances [do not] indicate lack of trustworthiness.

---

(…continued)

Subject to Rule 5-805, an electronic recording of a matter made by a body camera worn by a law enforcement person or by another type of recording device employed by a law enforcement agency may be admitted when offered against an accused if (i) it is properly authenticated, (ii) it was made contemporaneously with the matter recorded, and (iii) circumstances do not indicate a lack of trustworthiness.

5

*    *    *

THE COURT: Okay.  Well, at this point I think my interpretation of [Md. Rule 5-803(b)(8)(D)] is that it is anticipating that statements made that are electronically recorded on the body camera are admissible, as long as those predicates are met.

*    *    *

THE COURT: And based upon the testimony, the predicates are met.

The circuit court admitted the body camera recording and gave the defense a continuing objection to its admission.  The video begins at 1:40:50 with Ms. Ariani seated next to Sandra Epley on a couch across from Officer Morgado.  Officer Joshua Locke is also present.  Statements on the video include the following:

Officer Locke: He pointed a gun?

Ms. Ariani: No

Officer Locke: No gun tonight?

Ms. Ariani: But he went to bring me and locked in the car and put me in the trunk.

*    *    *

Officer Morgado:  What did he hit you with?

Ms. Ariani: With the hands.

Officer Morgado:  So, you guys are saying – he headbutted you?  You guys were just discussing – you were discussing something?

Ms. Ariani: (Unintelligible).

Officer Morgado:  He hit you like a ball?

Ms. Ariani: Yeah.  On the wall.

6

*     *     *

Officer Morgado: – pushed your head into the wall two times?

Ms. Ariani: Yeah, and – with his hand, and two times on the wall.

Officer Morgado: So, were you guys having an argument about something?

*     *     *

Ms. Ariani: And I was in the basement, and then my son used to sleep at 8:00 [PM].

Officer Morgado: Okay.

Ms. Ariani: At 8:00 [PM], and he (unintelligible) in the bedroom, and he didn't let him to sleep.

Officer Morgado: Okay

Ms. Ariani: And he was not comfortable.  My son was not comfortable, and I just went to the bedroom and saw that he's not asleep, and it was after 8:00 –

Officer Morgado: Okay.

Ms. Ariani: – o' clock [PM].  I just told him, why don't you let him to sleep, because he usually sleeps at 8:00 [PM].  And I asked him, did you change his diaper?  And he told, no, what are you – what, what do you want?  Why did you, why did you come to the bedroom?  I don't want to see you.  I don't want to – and he was shouting, and my son start, start crying.

Officer Morgado: Okay.

Ms. Ariani: Started crying.  And I took my son, and – I took my son in his, in his room, and I was changing his diaper, and he came again in his room, and he was discussing with me, he was shouting, and I told him, what do you want?  I'm just – it's his routine.  He has to sleep at 8:00 [PM].  And he was angry.  He's not normal.  He just try – he trying to find something to argue, to discuss, to shout.

7

Officer Morgado: Okay.

Ms. Ariani: Every day.  And I'm exhausted, and that's, that's all.  We didn't have any discussion.

Officer Morgado: Okay.

*       *       *

Ms. Ariani: I put my son in the bed and then went to the bathroom, and he came to my bathroom, and he was choking me.  What do you want?

(The videotape was muted from 2:29:02 – 2:29:17).

Ms. Ariani: And then he was choking me.  Then I ran down the stairs, and then he, in the back of [the] entrance door, he grabbed me –

Officer Morgado: Okay.

Ms. Ariani: – and he didn't let me to run away, and then hit me several time[s].

Officer Morgado: Okay.

Ms. Ariani: And two time he tr[ied] [to] hit head on the wall next to the mirror in the, in –

Officer Morgado: The hallway?

Ms. Ariani: There is a mirror next to the entrance door.

Officer Morgado: Okay.

Ms. Ariani: And then he – I was shouting.  I was shocked, and he pushed me to go upstairs.

Officer Morgado: Okay.

Ms. Ariani: Because my son was crying, and he told me you have to go upstairs next to your son.

Officer Morgado: Okay.

8

Ms. Ariani: And I don't – I didn't want to go upstairs.  I just wanted to be next to the door, because I know him.  He, he wanted to stop me in the room because he took my cell phone at first.  And then I told, I said, no, I don't want to go upstairs.  I'm going to go – I'm going to sleep here.  I told him, you are not going upstairs from anybody.  Why?  Why do you want me to go upstairs?

*　　*　　*

Ms. Ariani: And then when I told him these words, he, he was – he got so angry, and then oh you tell oh I'm scared from police?  Okay.  So, and then put some tape and then put me in the car (unintelligible).

*　　*　　*

Officer Morgado: How did you ever get yourself out of the trunk?  How did you get yourself out – you told me he put you in a car in a trunk?

Ms. Ariani: Yeah.

Officer Morgado: How did you get yourself out?

Ms. Ariani: In the garage.

Officer Morgado: In the garage?  The car never moved, right?

Ms. Ariani: No.

Officer Morgado: Okay.

Ms. Ariani: He hugged me.  He hugged me and pushed, and then brought [zip ties], because he just –

Officer Morgado: The tape?

*　　*　　*

Ms. Ariani: And then he put me in the trunk.  I didn't do anything.  I was like this, and then he brought [zip ties].

Officer Morgado: The ties?

9

Ms. Ariani: From garage, because we have them in the garage, and then put [zip ties] and closed the door, closed the trunk, and turned the lights off, and then went to the hall and told me, I'll be right back, and it's your last night.

After the video was played, the defense moved for a mistrial. Defense counsel argued that the State's interpretation of Md. Rule 5-803(b)(8)(D) was fundamentally unfair in that it would allow a "trial by body worn camera," in which witnesses could not be effectively cross-examined. The State responded that Mr. Paydar would not be prejudiced by the use of body camera videos in the manner contemplated by the rule because he had the power to subpoena witnesses and question them about the contents of the body camera video. The circuit court denied the motion for a mistrial, reasoning as follows:

Okay. Well, I think, although I didn't state it earlier, I think one thing that needs to be stated on the record sort of to put this in perspective is that this rule, [5-803(b)(8)(D)], is within the rule that deals with hearsay exceptions. So, clearly we have to be talking about statements or we wouldn't be talking about hearsay exceptions. If the body cam – if this rule only applied to the visual part of a body cam, it wouldn't be a hearsay exception because there's no language, there's no statements, there's no speaking. All you would do is move it in as a movie or as a video.

So, I think you have to look at the writing or the rule in the context of the rule itself, which is 5-803 is a rule dealing with hearsay exceptions, and therefore the rule has to be talking about statements, or else we wouldn't be, we wouldn't talking about hearsay to begin with. So, I think that, in my view, that 5-803(b)(8)(d) deals with the admissibility of statements that are electronically recorded on an officer['s] body camera, and as long as those predicates are met, that this rule allows its admissibility.

The following day, defense counsel renewed the motion for a mistrial on the grounds that the court's interpretation of Md. Rule 5-803(b)(8)(D) was incorrect. He

10

argued that the rules against hearsay were applicable to statements contained in the body camera recording. The court ruled that Md. Rule 5-803(b)(8)(D) was its own "separate and additional" exception to the hearsay rule and denied the defendant's motion.

**DISCUSSION**

## I. The Body Camera Recording

*Contentions*

Mr. Paydar contends that the circuit court committed reversible error when it admitted Officer Morgado's body camera recording, which included Ms. Ariani's out-of-court statements about the altercation on October 7, 2017. He argues that these statements were inadmissible hearsay, and that the court should have sustained defense counsel's objection to their admission.

The State, conceding that Ms. Ariani's statements were inadmissible hearsay, contends that any error in their admission was harmless beyond a reasonable doubt.

*Analysis*

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801(c). And "[e]xcept as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes, hearsay is not admissible." Md. Rule 5-802. "If one or more hearsay statements are contained within another hearsay statement, each must fall within an exception to the hearsay rule in order not to be excluded by that rule." Md. Rule 5-805. A trial court "has no discretion to admit hearsay in the absence of a provision providing for its admissibility. Whether evidence is hearsay is an issue of

11

law reviewed *de novo.*"  *Bernadyn v. State*, 390 Md. 1, 8 (2005); *see also Thomas v. State*, 429 Md. 85, 98 (2012).

Md. Rule 5-803(b)(8), commonly referred to as the "public records exception," permits admission of hearsay statements contained within public records and reports. Under the exception, information in a public agency record of "matters observed pursuant to a duty imposed by law, as to which matters there was a duty to report" would ordinarily be admissible.  Md. Rule 5-803(b)(8)(A)(ii).

But, under Md. Rule 5-803(b)(8)(C), a "record of matters observed by a law enforcement person is not admissible . . . when offered against an accused in a criminal action."  This rule, sometimes referred to as the "law enforcement exception," "place[s] police narrative reports outside of the common law business records exception," because "after-the-fact" narrative reports were considered less reliable due to the delay between when the observation is made and when the report is prepared.  Minutes of January 8, 2016 Meeting of the Court of Appeals Standing Committee on Rules of Practice and Procedure ("Rules Committee") at 15, 18 [hereinafter "Meeting Minutes"].

On December 13, 2016, the rules were amended to permit, under certain circumstances, the admission of certain electronic recordings made by body cameras or other recording devices to be "offered against an accused."[5]  Md. Rule 5-803(b)(8)(D).

---

[5] Court of Appeals of Maryland, Rules Order at 2, 106–07 (Dec. 13, 2016), *available at* https://www.mdcourts.gov/sites/default/files/rules/order/191ro.pdf [https://perma.cc/M4WF-W6VM]; *see also* Md. Rule 5-803(b)(8)(D) Rules Committee's note to 2016 amendment ("[Md. Rule 5-803(b)(8)(D)] establishes requirements for the admission of certain electronic recordings made by a body camera worn by a law

12

Concerned that the "law enforcement exception" could be understood as categorically preventing the admission of body camera recordings, and thereby undermine a primary purpose for employing such cameras,[6] the Rules Committee proposed, and the Court of Appeals adopted, the "body camera exception."

Md. Rule 5-803(b)(8)(D) permits a recording from a body camera worn by a law enforcement person to be "offered against an accused" if the recording: (1) is made contemporaneously; (2) is properly authenticated; (3) is otherwise trustworthy; *and* (4) any hearsay statements within the recording fall within an independent hearsay exception under Md. Rule 5-805. Although the last requirement is not expressly articulated in Md. Rule 5-803(b)(8)(D), it is subject to Md. Rule 5-805, which provides that "[i]f one or more hearsay statements are contained within another hearsay statement, each must fall within an exception to the hearsay rule in order not to be excluded by that rule." As

---

(…continued)
enforcement person or by another type of recording device employed by a law enforcement agency against an accused. [Md. Rule 5-803(b)(8)(D)] does not preclude an accused from offering on his or her own behalf a record of matters observed by a law enforcement person, including a recording made by a body camera.").

[6] Standing Committee on Rules of Practice and Procedure, 191st Report, Notice of Proposed Rules Changes at 14–15 (Oct. 13, 2016), *available at* https://www.mdcourts.gov/sites/default/files/rules/reports/191st.pdf [https://perma.cc/M4WF-W6VM] ("Concern was expressed by the Chair of the State Commission Regarding the Implementation and Use of Body Cameras by Law Enforcement Officers that subsection (b)(8)(C), which was intended to remove police *narrative* reports from the hearsay exception, might be held to apply as well to recordings made by body cameras which, if made in conformance with the policies established pursuant to law by the Maryland Police Training Commission, will be more reliable and trustworthy.").

explained by the Rules Committee, the amendment was not intended to broaden the types

of admissible hearsay:

> There is a double hearsay problem. Two different gates need to be open. The gates are between the evidence and getting it to the jury. All of the gates have to be open to attain the goal. . . . This [amendment] at least opens that second gate. The person would still have to get past the first gate. There would still be a hearsay exception to it. This [amendment] says that if there is a hearsay exception that applies, Rule 5-803(b)(8)(C) will not keep it out. An excited utterance could be recorded, and unless Rule 5-803, is amended, the video and audio of it would not be admissible under Rule 5-803(b)(8)(C).

Meeting Minutes at 27–28. In other words, for the recording to be admissible, the party

offering the evidence must establish a hearsay exception for statements contained therein.

Md. Rule 5-805.

*Ali v. State*, 314 Md. 295 (1988), *abrogated on other grounds by Nance v. State*,

331 Md. 549 (1993),[7] is instructive. In *Ali*, the defendant, citing the business record

exception, sought to admit as substantive evidence a police report in which an officer

included the statements of a victim who testified at trial. *Id.* at 302–03. The State argued

that the victim's statements were second-level hearsay that were not admissible unless a

---

[7] The Court of Appeals explained in *Wiggins v. State*, 352 Md. 580, 604 (1999):

> [T]he law in Maryland was that a prior inconsistent statement by a witness, other than a party, was admissible only to impeach the witness's credibility, and not as substantive evidence. *See Ali v. State,* 314 Md. 295, 305, 550 A.2d 925, 930 (1988); *Sun Cab Co., Inc. v. Cusick,* 209 Md. 354, 361–62, 121 A.2d 188, 191 (1956). Not until *Nance v. State,* 331 Md. 549, 629 A.2d 633 (1993) was that rule relaxed to permit an inconsistent statement to be admitted as substantive evidence if the statement was reduced to writing and either signed or otherwise adopted by the witness.

hearsay exception applied. *Id.* at 303. The Court of Appeals explained that direct sense impressions that "an officer may hear, feel, taste, or smell" may be admissible. *Id.* But "[c]omplications arise when what is heard and recorded is the speech of another." *Id.* When an officer hears and records the statement of another person, the statement constitutes second-level hearsay that should be excluded unless offered for a non-hearsay purpose or what was said falls within an independent hearsay exception. *Id.* at 303–05; *see also Diggs & Allen v. State*, 213 Md. App. 28, 73–76 (2013) (holding that trial court did not err in excluding under Md. Rule 5-803(b)(8) a police report containing the hearsay statements of another officer concerning the observations of the other officer), *aff'd on other grounds*, 440 Md. 643 (2014).

In this case, the circuit court viewed Md. Rule 5-803(b)(8)(D) as a "separate and additional" exception to the hearsay rule that categorically permitted the admission of the body camera video and the statements within it:

> So, the body camera is being looked at by the [Rules Committee] as a public record or report, and that's the reason why they're deeming it to be reliable, and they've carved out an exception where hearsay within hearsay would not be admissible. So, I think that this rule is basically identifying, when you're contemporaneously recording a statement, that it's inherently – that the content of the statement is inherently reliable because people down the road can watch it, hear it, listen to it, and they're assured of getting an accurate recitation of what was actually said. So, that's the purpose behind the public record and report, and they've now classified this body camera as a public record or report.

But its history makes clear that the body camera footage must satisfy the hearsay-within-hearsay rule to be admissible when offered against an accused. *See* Meeting Minutes at 15, 26–28.

15

As defense counsel argued at trial, under the circuit court's interpretation "witnesses [would] never have to come to court. That can't be – that would be impossible." And the State cogently recognized in its brief:

> If [Md. Rule 5-803(b)(8)(D)] authorized the introduction of any and all hearsay statements recorded by an officer's body camera, a police officer could roam the crime scene, collecting statements from witnesses that implicate the defendant on his body camera, and the State could introduce those hearsay statements at trial without ever calling the declarants to testify at trial. That result would conflict with well-settled, black-letter hearsay law and cannot be the way in which the Court of Appeals intended the rule to operate.

We agree.

In short, Ms. Ariani's hearsay statements in the recording were offered for the truth of the matter asserted. In the absence of qualifying under another exception to the hearsay rule,[8] they were not admissible under Md. Rule 5-803(b)(8)(D).

---

[8] At one point during trial, the State, without identifying any particular statements, indicated that "there's also statements that [Ms. Ariani] makes that would also qualify as excited utterances." The circuit court did not address the issue or consider it in admitting the video under Md. Rule 5-803(b)(8)(D), and the State does not pursue it on appeal.

Nor did the State argue that any of Ms. Ariani's prior statements during the recorded interview were admissible under Md. Rule 5-616(c)(2) for the limited purpose of rehabilitating her credibility. *See, e.g., Quansah v. State*, 207 Md. App. 636, 658 (2012):

> When a prior consistent statement is inadmissible under Rule 5–802.1(b), it may nevertheless be admissible as nonhearsay to bolster credibility under Rule 5–616(c)(2), which provides that "[a] witness whose credibility has been attacked may be rehabilitated by . . . evidence of the witness's prior statements that are consistent with the witness's present testimony, when their having been made detracts from the impeachment." *See* [*Holmes v. State*, 350 Md. 412 (1998)] at 426–27. Although it is appropriate for the trial court to give a limiting instruction that the jury may not consider such

16

## II. Harmless Error

*Contentions*

Mr. Paydar contends that the introduction of the body camera recording was not harmless because the State relied on the recording to bolster Ms. Ariani's credibility.

The State, noting a concession at trial that Mr. Paydar committed an assault and false imprisonment, contends that the admission of the statements recorded in the body camera footage had no impact on the jury's assessment of her credibility. More particularly, it asserts that Mr. Paydar did not contest Ms. Ariani's testimony that Mr. Paydar tied her up with electrical tape and zip ties, put her in his SUV, and locked her in the trunk.

It also contends that "[b]ecause [Ms.] Ariani's statements in the [recording] were inconsistent with the in-court testimony that [Mr.] Paydar claimed was exaggerated, the [body camera recording] could not have impacted the jury's assessment of [Ms.] Ariani's credibility."

*Analysis*

In a criminal case, an error by a trial court is harmless only when a reviewing court "is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict." *Dorsey v. State*, 276 Md. 638, 659 (1976). Once error is

---

(…continued)
      rehabilitative statements as substantive evidence, the trial court need not do
      so in the absence of such a request. *Id*. at 429.

17

established, the State bears the burden of showing affirmatively that the error was not prejudicial. *See Denicolis v. State*, 378 Md. 646, 658–59 (2003).

Relevant to a harmless error analysis is "any factor that relates to the jury's perspective of the case" and "where credibility is an issue . . . an error affecting the jury's ability to assess a witness'[s] credibility is not harmless error." *Dionas v. State*, 436 Md. 97, 109–10 (2013); *see also Devincentz v. State*, 460 Md. 518, 561 (2018); *Martin v. State*, 364 Md. 692, 703 (2001); *Howard v. State*, 324 Md. 505, 517 (1991); *Wallace-Bey v. State*, 234 Md. App. 501, 546 (2017).

The Court of Appeals has made clear that to determine whether there was sufficient independent evidence without considering the evidence admitted in error, i.e., an "otherwise sufficient test, . . . is a misapplication of the harmless error test." *Dionas*, 436 Md. at 117 (internal quotation marks omitted). In other words, to consider "the State's evidence apart from [a particular witness's] testimony" is not a "proper inquiry." *Id.* at 118. The question for the reviewing court is "whether the trial court's error was unimportant in relation to everything else the jury considered in reaching its verdict." *Id.*

In *McCray v. State*, 122 Md. App. 598 (1998), we concluded that the trial court erred in admitting a prior consistent hearsay statement of the defendant's accomplice, Tawanna Howell. The only evidence of the defendant's involvement in the crime was the testimony of Ms. Howell and her mother. *Id.* at 602–04. Over defense counsel's objection, Ms. Howell's mother testified as to what Ms. Howell had told her about the robbery and murder, which was consistent with Ms. Howell's trial testimony. *Id.* at 607–

08. The State argued that "because the same evidence had been placed before the jury during [Ms.] Howell's own testimony," the error was harmless. *Id.* at 610.

We held that "[b]y allowing Ms. [Howell's mother] to testify about [Ms.] Howell's prior consistent statements, the State impermissibly bolstered [Ms.] Howell's credibility," and that "when the State's case depends virtually exclusively on the credibility of a witness . . . the bolstering of the witness's credibility by prior consistent statements cannot be harmless error." *Id.* at 610–11; *see State v. Cox*, 298 Md. 173, 184–85 (1983) (quoting *Dorsey*, 276 Md. at 659) (noting that when one side's case is based on the testimony of one witness, the Court "must be satisfied that there is no reasonable possibility that the evidence [erroneously admitted] may have contributed to the rendition of the guilty verdict.").

The State's case rested on Ms. Ariani's credibility. She was the only witness who could provide direct evidence of Mr. Paydar's actions on the night of October 7, 2017. And, the circuit court instructed the jury that it could consider Ms. Ariani's statements in the body camera video for their substantive truth:

> [Y]ou will recall that [Ms.] Ariani testified in the State's case during the trial. You will also recall that it was brought out that before this trial she made statements concerning the subject matter of this trial. **Even though these statements were not made in this courtroom, you may consider these statements as if they were made at this trial and rely on them as much, or as little, as you think proper.**

(Emphasis added.)

Did the State use the body camera footage to bolster Ms. Ariani's credibility? Its closing rebuttal reflects that it did:

19

[W]hen we watched the . . . body cams of . . . the event back on October 7th, her demeanor is very evident, and you'll get a chance to review them, review them again. **You don't have to take her word for it on the witness stand** that she was scared for her life, okay, or the other witnesses['']. You can see it in her face, and you can hear it in her voice. There's no doubt, not just reasonable doubt, any possible doubt when you watch those body cameras, and . . . that's why they're so valuable when you see them. We don't, you don't have to rely on what people are saying about what happened**.** You know exactly how she was feeling right after the event, **and she's highly credible because of that.**

\* \* \*

Okay, **let's talk about her prior, her consistent prior statements, all the things she says that are the same when she testifies** – when she testified in the trial back with her prior statements. Right? Right? The strangulation and choking, multiple times – there were at least three or four different times she said that, right, in the course of the trial and all the evidence you have; that the defendant slammed her head against the wall twice, she was dizzy, in pain – **she never varies about the amount of times he slammed her head to the wall.** It's always twice, multiple times, in multiple statements. Okay?

The death threats that were made to her by the defendant, all right – **always multiple death threats, they were always very specific**, okay, and they were made multiple times. Every time – every statement she gives, right, she's always consistent about the fact. Right? Every statement she . . . gave, **whether it was sworn testimony here or prior statements**, she's duct-taped, she was zip-tied, thrown into the trunk, and the defendant went to get his gun – **these are all prior consistent statements.**

She is always clear about fearing for her life, never wavered about that on the stand, in prior statements as well.

(Emphasis added.)

At trial, the State, in its rebuttal, focused on the consistency of Ms. Ariani's trial testimony with her video statements, but, on appeal, it argues that some of Ms. Ariani's statements in the video were "*inconsistent* with her trial testimony and [therefore] undermined rather than bolstered her testimony." For example, she did not mention in

the recording that Mr. Paydar choked her in the bedroom and how it impeded her ability to breathe, or that Mr. Paydar slammed her against the wall, causing her to feel dizzy.

The record reflects that, mostly by omission, some of Ms. Ariani's statements to the police differed from her trial testimony. But, for the most part, her recorded statements were consistent with her trial testimony. At trial, she recounted details of what sparked their argument. She stated that Mr. Paydar choked her in the bathroom, chased her while she attempted to escape him, bound her with zip ties and tape, and locked her in his SUV. All of that was consistent with the prior statements in the body camera footage heard and seen by the jury. As we stated in *McCray*, "it is the[] consistency [of the statements] that is the very nature of the harm." 122 Md. App. at 610.

The State also asserts that the admission of the body camera footage was harmless because defense counsel conceded in closing argument that Mr. Paydar committed false imprisonment and, in doing so, some level of assault. To be sure, concessions[9] were

---

[9] In closing, defense counsel stated:

> There's no dispute that [Mr. Paydar] tied up [Ms. Ariani] and put her in the back of the car. There's no dispute about that, and you're not here to decide that issue. What you're here to decide is what crimes were committed when he did that, and the State is trying to make this into something that it is not. Every step of the way they're trying to exaggerate. They're calling an assault an attempted murder. They're calling a false imprisonment a kidnapping.

> \* \* \*

> What, what he did was a false imprisonment . . . .

> \* \* \*

21

made at the close of the case when the body camera footage had been admitted over repeated objections and the denial of two requests for a mistrial.

As the Court of Appeals explained in *Dorsey*, 276 Md. at 657–58:

> An evidentiary . . . error in a trial is bound, in some fashion, to affect the delicately balanced, decisional process. The abnegation of a particular rule upon which the defense intended to rely may often inflict more damage than initially apparent; a meritorious line of defense may be abandoned as a result; an important witness may not be called; strategies are often forsaken. The future course of the trial inevitably must be changed to accommodate the rulings made. It is the impact of the erroneous ruling upon the defendant's trial and the effect it has upon the decisional process which is of primary concern . . . .

In opening statement, defense counsel stated that "we know that the evidence is going to show you that our client is not guilty. Not guilty." And throughout the trial, defense counsel argued that Ms. Ariani should not be believed. He challenged her credibility as to what incited the October 7 incident, the extent of any injuries, and her manner of escape from the SUV. The testimony of the Epleys, who corroborated parts of Ms. Ariani's testimony, was also challenged and impeached. It was only after the admission of the body camera recording that defense counsel conceded any offenses, arguing that the State had overcharged Mr. Paydar.

---

(…continued)

> . . . I'm conceding that a crime was committed. You can't bind a person up and move them around their own house. It's a false imprisonment.

> \*     \*     \*

> . . . You grab someone and you tie them up, you're committing an assault. There's no question about that[.]

Another factor for consideration in a harmless error analysis is the jury's actions during deliberations. *Dionas*, 436 Md. at 111–12. "[J]ury notes sent over the course of deliberations" and "the length of jury deliberations provide context, albeit not necessarily conclusive, for the evaluation and understanding of the jury's findings, and thus, perspective." *Id.* In this case, the trial lasted three days, and the jury deliberated over the course of two days.[10] On the second day of deliberations, a jury note stated, "Are we required to render a verdict on all charges . . . or can we render a verdict on one charge and declare a hung jury on the other charges?"[11] About one hour later, the jury submitted another note, asking: "We cannot come to a unanimous decision on one of the charges.

[10] The jury trial started on June 25, 2018. Testimony was complete on the morning of June 28, 2018, and the jury began their deliberations at approximately 4:00 PM that day. The jury continued to deliberate until 10:00 PM that evening. On June 29, 2018, the jury resumed their deliberations at 9:30 AM until they reached their verdict at approximately 4:29 PM.

[11] The court responded by providing Maryland Criminal Pattern Jury Instruction 2:01, Jury's Duty to Deliberate:

> The verdict must be the considered judgment of each of you. In order to reach a verdict, all of you must agree. In other words, your verdict must be unanimous. You must consult with one another and deliberate with a view toward reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.

> During deliberations, do not hesitate to reexamine your own views. You should change your opinion if convinced you are wrong, but do not surrender your honest belief as to the weight or effect of the evidence only because of the opinion of your fellow jurors or for the mere purpose of reaching a verdict.

How should we proceed?"  The court responded by explaining that in cases where jurors are "deadlocked on at least one charge, then what we do is we take . . . a partial verdict. So, [for] a partial verdict . . . we turn a verdict on those counts that you have reached a unanimous verdict, whether guilty or not guilty, and then on the charges where there's no unanimous verdict, there's no verdict."  Approximately fifteen minutes later, the jury reached a partial verdict, finding Mr. Paydar guilty of false imprisonment and first-degree assault but "no verdict" on attempted murder, kidnapping, or second-degree assault.  In other words, after a three-day trial, the jury deliberated over the course of two days and rendered a verdict only on offenses that had been partially conceded.[12]  This suggests that the jury struggled with Ms. Ariani's credibility.

Because the State used the body camera footage to bolster Ms. Ariani's credibility, we are not "able to declare a belief, beyond a reasonable doubt" that its admission "in no way influenced this verdict[.]"  *Dorsey*, 276 Md. at 659.  Therefore, we cannot conclude its admission was harmless.

> **JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED.  CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.  COSTS TO BE PAID BY MONTGOMERY COUNTY.**

---

[12] The conceded assault was grabbing Ms. Ariani and tying her up; that would not necessarily be a first-degree assault.

24